153 Ill. App.3d 616 (1987)
505 N.E.2d 1360
In re J.H., A Minor.
No. 86-0255.
Illinois Appellate Court  Second District.
Opinion filed March 24, 1987.
*617 James E. Ryan, State's Attorney, of Wheaton (Barbara A. Preiner and Judith M. Pietrucha, Assistant State's Attorneys, of counsel), for the People.
No brief filed for appellee.
Judgment affirmed.
JUSTICE UNVERZAGT delivered the opinion of the court:
On October 29, 1985, the State filed a petition in juvenile court alleging that the minor, J.H., was an abused minor as defined by sections 2-4(2)(a)(iii) and (2)(b) of the Juvenile Court Act (the Act) (Ill. Rev. Stat. 1985, ch. 37, par. 702-4(2)(a)(iii), (2)(b)). A series of hearings were held on the petition, and on February 27, 1986, the trial court found that the State failed to prove the allegations. The State appeals, contending it presented sufficient testimony to prove the allegations of its petition by a preponderance of the evidence.
A guardian ad litem was appointed for J.H., and the public defender was appointed to represent her during the hearings. J.H.'s mother and father were represented by separate counsel during the hearings. Although no appellee's brief has been filed in this cause, we proceed to consider the evidence adduced below inasmuch as the interest of a minor is involved. First Capitol Mortgage v. Talandis Construction Corp. (1976), 63 Ill.2d 128; In re Adoption of Daly (1976), 36 Ill. App.3d 962.
The petition and the bill of particulars alleged that J.H. had been sexually abused at her home on or about September 26, 1985. It was also alleged in an amended bill of particulars that J.H. had suffered numerous burns on her body and was frequently absent from school; that she was not outfitted with a hearing aid although she suffers from a severe hearing loss; and that the living conditions of the family home were injurious to her health in that the home was not kept in a sanitary state.
Testimony was heard on January 29, February 5, 19, and 27, 1986. The first witness called to testify was Dr. Thomas Mullin, an *618 emergency medicine specialist at Good Samaritan Hospital. He examined J.H. in the hospital emergency room on October 18, 1985. J.H. was brought to the hospital by a social worker who told the doctor that J.H. had indicated to her that she had been sexually assaulted by her father. He proceeded to perform a routine physical examination looking for signs of trauma. J.H. was hesitant and apprehensive about the doctor's touching her. He found her reaction to be unusual for a child her age because in his experience they usually have no inhibitions and often run around the emergency room naked. Her reaction indicated to him either that she had some sort of bad experience or was frightened by him in some way. Because of this reaction, the doctor did not thoroughly examine her genital area for fear of traumatizing her further. He did notice the tissue which surrounds the opening to the vaginal area appeared slightly inflamed, but the redness was not particularly remarkable. The inflammation observed could have been consistent with either a genital infection or trauma to the area, but the oral, anal and vaginal swabs taken were found to be normal, and no infection was noted. The inflammation was more likely the result of either self-induced or induced trauma from some other external force. He reiterated that the inflammation was not very impressive, and that he felt the most significant part of his examination was her reaction to him. He testified the slight inflammation observed could be consistent with an object being inserted or rubbed against the vaginal area. As in all cases of suspected rape, he prescribed antibiotic therapy. He speculated that because J.H. had been deaf and dumb since birth, she was perhaps a bit behind emotionally and probably more vulnerable and naive than a normal five-year-old.
On cross-examination, the doctor testified that J.H.'s hymen was apparently intact, although it was not imperforate, which means that the hymenal tissue did not totally span the opening to the vagina. He testified this condition was not uncommon to find and was totally consistent and normal for someone her age. The condition of J.H.'s hymen ruled out the possibility of total penetration during sexual intercourse, but not necessarily penetration by a finger.
On further cross-examination, he acknowledged he was looking for signs of sexual abuse in view of the history given him by the social worker. He stated that the trauma he viewed could have been the result of habitual scratching of the area. He stated J.H. is probably the first deaf/mute girl on whom he has performed a vaginal exam.
J.H.'s paternal grandmother testified that J.H. was currently living *619 with her in Darien, Illinois, and had been since about late September 1985. She was a frequent visitor to her son's home in Westmont where J.H. resided, and she often found the house in disarray, with clothes lying all over and dishes that appeared to have been unwashed for about a week. On one occasion, after J.H. was already living with her, she testified she smelled cat urine and saw cat feces on the back porch and by the kitchen door. She also related an occasion about three years prior when there was an accumulation of about eight bags of garbage at the family's other residence in Woodridge. This was at a time when J.H.'s mother had left the family and the witness' son was in a cast and had custody of both J.H. and her brother, Jason. He and the children then resided with the witness for a time after that. The witness was the one who suggested, when J.H. was about two years old, that her hearing be tested; she was diagnosed at that time as profoundly deaf.
On cross-examination, the witness testified that although she does not like her daughter-in-law, she does not want J.H. to have to stay with her (the witness). On further cross-examination, she testified she reported the unsanitary condition of the Woodridge residence to the Department of Children and Family Services (DCFS), but the children were living with her at the time, and it was unable to help her. She testified that she was aware that J.H. was susceptible to swollen glands, upper respiratory bronchitis and croup, and that on several occasions when J.H. was home on a school day it was because she was ill. The witness testified J.H. had an attack of croup in October, when she was living with her, and the paramedics were called. Testifying further on cross-examination, the witness stated that ultimately she would like her son and his wife to get back together and have J.H. back in their home.
The court swore in Shirley Sutherland as an interpreter for the deaf to assist in the examination of the next witness, Gwen Hammersmith. Hammersmith is a clinical consultant for the Du Page County mental health department. She has been there about three years, and she has counselled approximately 30 hearing-impaired clients. She has been hearing-and-speech impaired since birth. She has seen J.H. three times since January 1986, after she was referred by DCFS. During those approximately one-hour long sessions, J.H. showed through the use of dolls that she was aware of all the various sexual activities between her parents which she indicated she learned about because she and her brother saw the parents in bed.
On cross-examination, Hammersmith stated that J.H. definitely is of normal intelligence for her age. In using the dolls to describe sexual *620 activity, J.H. referred to them as her mother and father. J.H. specifically described her parents making love, and related a variety of positions during sexual activity; the woman doll on top of the man doll, up and down oral sex motions, having sex with woman doll standing and the man doll behind her back, and the man doll sucking the woman doll's breast. During none of her three interviews with J.H. did J.H. refer to the dolls other than as her mother and father. When she asked J.H. questions about her father having sex with her, J.H. said "No, no" using emphatic body language, and she became unwilling to cooperate further. On further cross-examination, Hammersmith testified she did not ask J.H. if she had seen anything like these sexual activities on television. On redirect examination, Hammersmith stated that J.H. was not agitated or uncomfortable when demonstrating this sexual activity of the dolls. On re-cross-examination, Hammersmith testified J.H. never seemed frightened of her father and that when she observed her meet him, her reaction was very loving.
The State's next witness was Joyce Zimmerman, a school counsellor for hearing-impaired students at Pleasant Lane School in Lombard and Edgewood School in Woodridge. Since September 1983 she saw J.H. at least once a week in a classroom group, and since March 1985 she has counselled J.H. individually one to two times a week. She testified she believed that during the 1983-84 school year J.H. was absent 98 of 180 school days. In the 1984-85 school year, Zimmerman testified she believed J.H. was absent 41 1/2 days of 180 school days. In the current school year, Zimmerman testified she believed J.H. was absent 12 of 36 school days until the time she was placed with her grandmother. Since then, J.H. has missed 3 out of 55 school days. She recalled that J.H. was absent September 26, 1985, and October 22, 1985.
During the 1984-85 school year, the witness testified that J.H.'s family had a fire at their apartment. J.H. was experiencing some social and emotional difficulty, and she began receiving individual counselling. She was experiencing sleeping problems and would come to school extremely tired and fatigued. She came to school on several occasions with a burn on her arm, and once she could not use the special auditory training unit (a hearing aid used at the school) because her ear hurt. Zimmerman testified J.H. told her that her daddy hit her ear with a toy truck. Twice in February, J.H. came to school with a burn on her arm: one burn was determined to be the result of an accident with her Aunt Sheryl's cigarette, and one burn was from an accident with a curling iron. In April, J.H. had another cigarette *621 burn which, using dolls, role playing and reverse role playing, J.H. "made it quite evident" was not an accident and was done by her daddy.
Although J.H. does have her own personal hearing aids, the witness testified that from January 1985 until June 1985 the aids were not seen at school. These personal hearing aids enable J.H. to hear loud environmental noises and make her aware of loud speech in her environment.
On October 1, 1985, Zimmerman saw J.H. and, noting that she had not been at school the previous week, asked her if she had been sick. J.H. replied "No," that they had gone to visit a friend. J.H. then told her that her mom had been bad and that policemen had come and put handcuffs on her and had taken her away. The witness was unsure about her understanding of what J.H. was telling her, so she had her act it out for her. J.H. seemed very "antsy" about telling her about it, so in order to calm her down, she was told to choose something with which to play. J.H. took the family dolls, named one doll Mother and threw her in the garbage. She took a second doll, named him Jason and hid him in a desk. She then took two dolls and named one Dad and the other J., after herself, and laid them down. In response to a comment from Zimmerman, J.H. said the dolls were not playing. J.H. moved the J. doll so its head was near the genital area of the father doll, and held him in that position, moving them slightly. J.H. then reversed the dolls so that the father doll's head was toward the J. doll's genital area. She was asked what they were doing, and she said, "Daddy and J., daddy and J. on the bed." The counsellor was unsure what to do, so she sent J.H. back to her classroom. In previous sessions, J.H. had played with the dolls in a fairly typical family-type manner.
When Zimmerman asked J.H.'s teacher about the police/handcuff story, the teacher reported that J.H. had repeated the story to her also. J.H.'s mother was called, but could not understand where the story came from, although she thought it was possible it might have been from television. Zimmerman mentioned the J.H. incident to her supervisor, who asked her if she was sure of the activity J.H. was indicating to her. Zimmerman said she was not sure, so the supervisor suggested that different dolls be available in their next session to see if J.H. would repeat the same incident in another way.
Zimmerman next saw J.H. on October 8, 1985. After being asked if she remembered what she said last time, J.H. retold the story about her mother and the police, and once again threw away the mother doll and hid the Jason doll. She took the doll named Daddy *622 and removed the clothes. She took a color marker and tried to draw a belly button, pubic hair and genitals on the doll. J.H. didn't do anything else with the doll at that time, and the witness decided not to pursue the incident, feeling she lacked experience working with this type of case.
Zimmerman again saw J.H. on October 10, 1985, for counselling. J.H. drew pictures of her family, giving her mother and father angry faces and calling them bad, and then crossing them out. She drew herself and Jason as playing, with happy, smiling faces. J.H. had never exhibited this type of attitude toward her parents before, except when her mother was away from home, or her father burned her arm or hit her with the truck; she would say, "Mom bad," "Dad bad," in sign language.
Zimmerman attempted one other time to have J.H. repeat the incident, but J.H. would not cooperate and exhibited avoidance behavior. Zimmerman later contacted social workers from the Westmont and the Lombard schools. Both advised that she should try to get J.H. to reconfirm the information, which Zimmerman reported to them that she had already tried to do. They then told her it would be better to report that type of incident to the DCFS "Hot Line" and be wrong, than to not report it at all, and Zimmerman did so on October 16.
Zimmerman testified that on October 18, 1985, Detective Rick Musil of the Westmont police department, and Diane Bergslien, an investigator from the State's Attorney's office, came to the school to interview J.H. Bergslien interviewed J.H. with the assistance of Zimmerman, who would suggest to Bergslien how to reask a question if J.H. was not understanding it as posed by Bergslien. After Bergslien used various examples of specific behavior so that J.H. would understand her questions, J.H. acknowledged knowing the difference between good and bad touches, and telling the truth and a lie. J.H. indicated she recalled telling Zimmerman her mother was bad and was taken away by the police, but she could not give any further details. J.H. related that she and Dad were on the waterbed. Bergslien gave J.H. two dolls; J.H. named one J., after herself, and one Jason, but when Bergslien took the doll's cap off and stood it up, J.H. changed the name of the doll to Dad. J.H. then undressed the dolls, and she put the dolls together simulating intercourse with the J. doll on top. She repositioned the dolls so that the J. doll was sitting on the dad doll with its back toward him. She tried to get the penis of the dad doll into the vagina of the J. doll. Bergslien testified she asked if daddy had ejaculated, which was hard for J.H. to understand, *623 but J.H. said no. J.H. next positioned the J. doll near the daddy doll's penis. Bergslien asked if daddy kissed or licked J.H.J.H. said "Yes," and indicated that daddy had kissed her on the breast and licked her. J.H. indicated that the dolls went to sleep after this.
When asked her opinion of J.H.'s reputation for telling the truth, Zimmerman stated that although she has difficulty communicating because she doesn't know all the words, J.H. has always told her the truth when she does have the words and the language. Moreover, Zimmerman testified that hearing-impaired children generally focus on things that have happened and their experiences. Although they do engage in imaginary play, they rarely fantasize or act out behavior they have not experienced. Compared with normal children, hearing-impaired children do not imagine or fantasize stories they would hear on television since they have little or no exposure to them.
On cross-examination, Zimmerman stated that she saw J.H. regularly at school on Tuesdays and Thursdays and that prior to the October 1, 1985, interview J.H. had been absent on Thursday, September 26, 1985. Zimmerman attempted to verify the story regarding the mother's arrest, but the mother denied anything like that occurring. Zimmerman had earlier verified the story about a new baby in J.H.'s family, which J.H. had referred to as "Mom's baby." Zimmerman learned that J.H.'s aunt Sheryl had just had a baby. She described how deaf children are unable to say "I wish I had" and often say "I have" when they mean "I wish I had." Deaf children just don't have the language to say it.
Zimmerman characterized J.H.'s moods as fluctuating, and stated that she did not seem to have good control over her emotions or have positive ways of expressing her emotions. J.H. was adamant that her mother's arrest was not something she saw on television, and that it was true. Although J.H. expressed an interest in watching television and watched it as a recreational-type thing, Zimmerman noted that young deaf children usually do not stay with television programs very long since they cannot understand the dialogue.
Zimmerman acknowledged that when the discussion about babies occurred, there was a boy at school that J.H. was calling her boyfriend. J.H. and the boy had indicated to the teacher that the little boy was the daddy and J.H. the mommy, and that J.H. wanted to have a baby. This occurred during the first couple of weeks of school in September 1985. J.H. would point to the particular boy and would indicate "You, daddy." Zimmerman stated she did not ask J.H. during the October 1 interview with her whether the daddy referred to *624 in the doll-playing incident meant this boyfriend, nor did she and Bergslien ask that question during the October 18 interview. Zimmerman testified she felt there was no reason to, since J.H. did not refer to that boy as daddy unless they were playing house.
On further cross-examination, Zimmerman was asked whether J.H. was able to convey the idea of a third person's emotion, that is, whether her father was actually angry and intentionally burned her, or whether he may have been concerned and excited if she ran up against his cigarette. Zimmerman replied that to her knowledge, J.H. had a label for "angry" versus "worried" and "concerned." Other than the burn, she never noticed any indication that J.H. was an abused child. She did not think J.H. confused her boyfriend with the term "daddy" when she asked her if the doll was daddy or a different man, but J.H. did describe her boyfriend at school as daddy in different play situations. On further cross-examination, Zimmerman testified that the signs for "daddy" and "man" are somewhat similar, and that some very young deaf children will call any man daddy, but that J.H. said it was her daddy.
The State's next witness was Diane Bergslien. Bergslien testified regarding the interview with J.H. that took place October 18, 1985, at school with the interpreter, Joyce Zimmerman, also present. Bergslien's testimony recalling the interview was similar to that provided by Zimmerman. After the interview, she spoke with Detective Musil and Zimmerman regarding J.H.'s absenteeism record, and she determined that J.H. was absent on September 26, 1986, a few days before her first unusual session with Zimmerman.
Bergslien also interviewed J.H. on November 1, 1985, after J.H.'s grandmother had indicated that J.H. had changed her story, saying that her daddy never hurt her. On that date, J.H. refused to speak with Bergslien and Zimmerman. During the interim between the two interviews, J.H. had resided with her paternal grandmother. On January 24, 1986, Bergslien spoke with J.H. at the courthouse in the presence of three assistant State's Attorneys. J.H. showed an act of sexual intercourse between the daddy doll and the J. doll, without much detail, except that in response to a question, J.H. said that something wet came out of the penis.
On cross-examination, Bergslien testified that J.H. said her daddy's penis went inside of her. J.H. said that the sexual activity with her daddy had never happened before and did not happen afterward either. Bergslien testified that J.H. was the first hearing-impaired child she had interviewed. During the course of the three interviews with J.H., Bergslien did not witness J.H. pull, rub or scratch her *625 genital area. Bergslien was informed by Detective Musil that the Westmont police had no record of going to J.H.'s home.
Next, the State attempted to present the testimony of J.H. in the judge's chambers. However, J.H. had been ill and was unresponsive. Accordingly, the court agreed to defer her testimony to another day.
Cynthia Bane, a school social worker, was called to testify. Bane had had contact with J.H. during the 1983-84 school year, after J.H.'s teacher expressed concern that J.H. was in emotional distress, and that she had been without a hearing aid for two months. Bane assisted the family in getting a hearing aid for J.H. through the local Lions Club. Bane had contact with J.H.'s mother after the burns were noticed on J.H.'s wrist and upper arms. In Bane's opinion, none of the burns were abusive burns, that is, where there is something held down on the skin which causes the burn.
The hearing was recessed and resumed on February 19, 1986. The parties stipulated to J.H.'s absences in the last three school years: 38 1/2 days out of 176 days in the 1983-84 school year; 42 1/2 days out of 176 days in the 1984-85 school year; and 14 days during the period September 1985 to January 1986.
In chambers, the State again attempted to question J.H. She stated that she was six years old, and that she had a four-year-old brother named Jason. J.H. first agreed, and then refused, to answer the State's questions about what happened to her. J.H. stated that on one told her not to tell. Four dolls were produced and named J., after herself, Jason, and Mom and Dad. J.H. responded "No" to all further substantive questions posed by the State concerning the incident, denying that her father touched her, took off her pajamas, lay on the waterbed, kissed her, or that she had touched him.
Upon cross-examination, J.H. stated that she wanted to go home to her mommy and daddy. She further stated that her daddy never did anything bad to her, that he never touched her in the vaginal area, and never made her touch him. J.H. said that it was an accident when he burned her with his cigarette, and that it was an accident when she was burned by her Aunt Sheryl's cigarette too. It was then agreed by the parties that the State's final witness would be examined out of sequence.
The respondent father presented the testimony of Scott Purrucker, who was a long-time friend and family acquaintance. Purrucker testified that J.H.'s house was "average"; the cat had a litter box, and he noticed no foul odor, animal feces, insects, or garbage during his visits to the home approximately two or three times per *626 month.
John H., J.H.'s father, testified that the family lived in four different apartments in the last few years and had never been evicted. He denied committing any sex offenses against J.H., or that his wife was ever arrested. He explained the circumstances surrounding the incident in which J.H. was burned by his cigarette. He and his wife were sitting and talking with a friend, Jeanette Lawrence, when J.H. reached between him and Jeanette to get something from the end table where the ash tray was. J.H. brushed her arm against the cigarette, and he grabbed her and started brushing her arm off real fast because the hot part of the cigarette had broken off. She thought he was mad at her, and she said she was sorry. He tried to explain to her that it wasn't her fault. He testified they put a cold compress on it immediately and then some triple antibiotic ointment.
He testified that J.H. missed a lot of school due to her severe bronchitis, that she was sick for all of Christmas vacation in 1985, and that he took her to Good Samaritan Hospital in February due to the croup. He testified they had no bugs in their apartment, except some silverfish in the bathroom. They sprayed some Raid, but the cats would get sick from it. They have one cat and had two kittens for about eight months. The cats usually take care of the bugs. One of the cats defecated on the porch because it got locked out there. He testified his mother is a meticulous person, and that no one's house is as clean as hers. He testified he worked construction for the past few years and was sometimes unemployed in the summer months, but was working during the winter months. He testified that he rarely drank at home, although he kept beer in the house for company. He stated that his mother blames his wife for his failure to complete college.
On cross-examination, he testified that he communicates with J.H. through sign language, although he does not sign fluently. His wife makes the decision whether to keep J.H. home from school, and one time she brought work home from school for J.H. to work on while she was ill. He and his wife were separated a few times; once she took J.H., and the other time she left both of the children with him for about a month.
The court recessed and reconvened on February 27, 1986. The State presented as their final witness Shirley Robinson, a social worker with the Child Sexual Abuse Treatment and Training Center of Illinois. The State presented evidence of the witness' qualifications as an expert in the area of sexual abuse of children. Robinson proceeded to describe certain characteristics that are present in sexually *627 abused children, including regressive behavior, complaints about stomach aches, stuttering, and nail-biting. Additionally, abused children exhibit precocious sexual knowledge and often mimic sexual behavior. In drawings, they spontaneously use the color red and frequently add genitals and sexual organs to the people they draw. They show signs of anxiety and avoid discussing the molestation. She also found in her work that the children typically feel close to the family member who is molesting them, and that most often the father is the molester.
The typical family in which sexual molestation takes place is often respected and liked. The molesting fathers do not view themselves as child molesters and do not exhibit this behavior outside the family. Most often a family crisis, such as the loss of a job or an injury, precipitates the abuse. When interviewing a child alleged to have been molested, Robinson looks for detailed information from the child and other emotional behavior such as anxiety while talking about touching.
Robinson interviewed J.H. approximately a week before her testimony. Joyce Zimmerman was present as interpreter. Upon entering the room, J.H. first checked the anatomically correct dolls, looking for all their body parts, and then she put them down until the end of the session. J.H. was asked to draw pictures, and she drew pictures of her family. The first picture was of her mother's head only, and she used various colors. The picture of herself included genitalia and two dots for breasts. She scribbled in her entire body, which indicated to Robinson that J.H. was anxious about her body, or possibly it indicated some emotional disturbance or emotional problems. J.H. drew herself with large blue ears, which Robinson said was typical of children with hearing problems. When asked to color in where she did not like to be touched, J.H. used a red crayon to draw something that looked like ponytails in her hair, and indicated that she did not like to have her hair pulled.
J.H. next drew a picture of her father, depicting him with larger breasts than she drew on the picture of herself, and with a large penis. She colored the picture in red and orange. The witness testified the color red is significant in that children who spontaneously use the color red are those children typically who have been sexually abused, the red symbolizing anger, fear or pain sometimes.
Robinson testified that when she asked J.H. to draw a picture of her family, she drew a picture of her brother, Jason, depicting him with a smaller penis than that of her father and with breasts. The entire picture was done in red. J.H. then decided she didn't like the *628 picture of her mother, and she drew another one. This second picture was of her mother's whole body, but the face was somewhat distorted, with a very large mouth and no nose.
Robinson testified that she also uses art therapy with children whom she interviews for reasons other than sexual abuse. Typically, they do not use the color red in people drawings, and they do not draw genitals. She testified that if a child had witnessed sexual acts in person, or had viewed video or TV movies of sexual acts, it might be expected that they would draw genitalia, but that they would not use the color red. Also, children who have witnessed sexual activity tend to mimic that behavior, whereas a child who has experienced sexual activity can give many more details about it.
In her work with abused children, Robinson testified that it is not unusual to see recantation of a story in cases where the child has been removed from the home and wants to be back in the home with her parents. Based on her experience in the field and her interview with J.H., it was her opinion that J.H. was sexually abused by her father.
On cross-examination, Robinson stated it was possible that a child who had merely witnessed sexual activity will sometimes mimic the sexual act when using the anatomically correct dolls. Robinson testified that J.H. is the first deaf child she ever interviewed. She was aware that deaf children focus more on sights and smells. On further cross-examination, Robinson testified that often she is not the first person to interview a child alleged to be abused. She stated it would be difficult to make a suggestion on a subconscious level that would later come out in the drawings. Her opinion of the fact the drawing of Jason was done entirely in red was that Jason may also have been molested or may have been required to participate in some sexual act with J.H.
Robinson stated that children who have been sexually molested only once would exhibit the same characteristics as those who have been molested multiple times. When asked how she would account for the progressively different versions of the incident as related by J.H., the witness stated the different versions were typical of sexually abused children who do not anticipate the extent of the legal involvement which is the consequence of their report. Robinson testified she had no reservations about her opinion, which she based on the drawings, her resources, and her conference with a consultant for deaf children. On further cross-examination, Robinson stated her opinion was also based on J.H.'s spontaneous activity in undressing the dolls, and her reactions to her in the session.
*629 On redirect examination, Robinson stated it is not typical for children who have merely witnessed acts performed by others to name the anatomical dolls after themselves and another adult. On re-cross-examination, she stated it was of some importance that the first time J.H. saw the anatomically correct dolls she wanted to name the doll after herself and her brother, Jason, but that it was suggested to her that the male doll should be named Daddy instead. Although that may have suggested to J.H. who the dolls were, Robinson testified it nevertheless would not suggest what the dolls did with each other.
The State then rested its case, and the respondent mother's motion for a directed finding was denied. The respondent mother called Jeanette Lawrence, a 19-year-old friend of hers, to testify. Lawrence was a frequent visitor to the home during 1983 through 1985; she testified that the home was not unsanitary.
On cross-examination by the respondent father's attorney, Lawrence testified she was present when J.H. brushed up against her father's cigarette and burned her arm. Lawrence testified he grabbed J.H. at that time and she started trying to get the ashes off her because there were burning ashes on her arm.
J.H.'s mother, Denise H., testified that J.H. gets sick often and, consequently, misses a lot of school. She testified J.H. is anemic, constantly gets colds and high fevers and upper respiratory infections, and she is subject to croup. She admitted she is an overly cautious parent, and characterized herself as a "fair" housekeeper. She denied ever burning J.H. or seeing her husband burn her. She denied ever being arrested by the police and handcuffed. She testified her husband was working days in September and October 1985, and may have come home early one day, but otherwise he was not home during the day. When J.H. was home ill from school during September and October 1985, her father was not at home. She denied observing her husband physically or sexually abuse either child. When questioned about the discrepancy in J.H.'s absenteeism during the time she was with her grandmother, she testified she felt her mother-in-law sent J.H. to school on many occasions when she herself would not have done so, such as when J.H. has swollen glands even though she does not have a fever.
The defense then rested.
After hearing argument, the court stated:
"THE COURT: The Court wants to make it clear that it holds the Child Sexual Abuse Treatment and Training Center in Willowbrook  or Bolingbrook in the highest regards *630 [sic] and holds the expertise of Shirley Robinson in the highest regard.
However, I'm terribly troubled in this case. The opportunities to contaminate [J.H.'s] perception of what went on this case were just replete. And the miniscule details upon which Shirley Robinson formed her conclusion are so small that they could easily have been the result of contamination of a very young witness.
I'm unwilling to completely discount the testimony of the defense witnesses in this case.
There will be a finding of not proven."
 1, 2 The standard of proof applicable in this case was stated in In re Simmons (1984), 127 Ill. App.3d 943, 948:
"The standard of proof of abuse is that applicable in civil proceedings, i.e., a preponderance of the evidence (Ill. Rev. Stat. 1983, ch. 37, par. 704-6(1); In re Brooks (1978), 63 Ill. App.3d 328, 337, 379 N.E.2d 872, 879); and the primary consideration in such cases is the best interests and welfare of the child. (See In re Brooks (1978), 63 Ill. App.3d 328, 379 N.E.2d 872.) The finding of the trial court upon the issue of abuse must be given respectful weight and should not be disturbed unless contrary to the manifest weight of the evidence. See In re Brooks (1978), 63 Ill. App.3d 328, 337, 379 N.E.2d 872."
"By a preponderance of the evidence it is meant the greater weight of the evidence, not necessarily in numbers of witnesses, but in merit and worth that which has more evidence for it than against it is said to be proven by a preponderance. Preponderance of the evidence is sufficient if it inclines an impartial and reasonable mind to one side rather than the other. New York Life Insurance Co. v. Jennings, 61 Ga. 577, 6 S.E.2d 431." (Moss-American, Inc. v. Illinois Fair Employment Practices Com. (1974), 22 Ill. App.3d 248, 259.) "A proposition proved by a preponderance of the evidence is one that has been found to be more probably true than not. (See generally Illinois Pattern Jury Instructions, Civil, Nos. 21.00 and 21.01 (2d ed. 1971).)" (In re Estate of Ragen (1979), 79 Ill. App.3d 8, 13.) For a finding or judgment to be against the manifest weight of the evidence, an opposite conclusion must be clearly evident. (In re Application of Kane County Collector (1985), 135 Ill. App.3d 796), and a reviewing court may not overturn a judgment merely because it might disagree with it or would come to a different conclusion had the issue been presented to the court of review in the first instance. (In re *631 Estate of Elson (1983), 120 Ill. App.3d 649.) The trier of fact which observed the demeanor of the witnesses is best able to judge their credibility and to determine how much weight to give their testimony. Cosmopolitan National Bank v. County of Cook (1984), 103 Ill.2d 302.
 3 We find the judgment of the trial court that J.H. was not proved to be an abused minor was not contrary to the manifest weight of the evidence. In reaching this determination, we are particularly mindful of the fact that the trial court had the opportunity not only to hear the witnesses, but also to see them as well, an important factor in this cause where a significant portion of the testimony was itself given by way of sign language and much of the other testimony was based on the sign language of the child as those signs were interpreted by others. Thus, the trial judge was particularly in a superior position to hear and weigh evidence and determine the credibility and demeanor of the witnesses. We also note that although the State argued at trial that the sex offenses committed against J.H. were "part and parcel of an environment that is injurious to her welfare," it has been held that sexual abuse is not part of a cause of action for injurious environment. (In re Harpman (1986), 146 Ill. App.3d 504.) The State's petition for adjudication charged the minor here was abused as provided in both sections 2-4(2)(a)(iii) (sexual abuse) and 2-4(2)(b) (injurious environment) of the Act (Ill. Rev. Stat. 1985, ch. 37, pars. 702-4(2)(a)(iii), (2)(b)).
 4 It is clear here that the court held the expert witness in this cause in the highest regard. However, the trial judge, like a jury, as the trier of fact is not bound to accept the opinion of an expert on an ultimate issue. (Harris v. Bethlehem Steel Corp. (1984), 124 Ill. App.3d 449, 453.) Experts' opinions are only as valid as the bases or reasons for them; the trial judge is to analyze and evaluate the factual basis for the expert's opinion rather than rely on the ultimate opinion itself. (In re T.D.W. (1982), 109 Ill. App.3d 852, 855.) The court here felt that the opportunities to contaminate J.H.'s perceptions of what occurred were replete, and that Shirley Robinson's conclusions were based on what it considered to be miniscule details which could easily have been the result of contamination of the very young witness.
 5 There is ample evidence in the record that questions posed to J.H. often had to be reformulated so that they could be signed and understood. There was also evidence that J.H.'s vocabulary did not include concepts such as "I wish I had" as opposed to "I had," and that interpretation of J.H.'s signs proceeded on the assumption that *632 she grasped and could communicate the distinction between such emotions as anger, concern and worry. The record also allows the reasonable inference that J.H. was susceptible to the influence of others in that she reportedly had "changed her story," absolving her father, two weeks after she had been placed with her paternal grandmother.
Notably, there was evidence adduced which suggested that the wellspring of the sexual behavior she portrayed using the dolls may have been other than the abuse alleged. J.H. and her brother had witnessed their parents engage in a variety of sexual activity, and there was evidence that J.H. had a boyfriend at school whom she designated "daddy" when they were playing house, and that J.H. "wanted to have a baby." The asserted significant of J.H.'s drawing of her father using the colors red and orange was largely diminished in light of other evidence that she also drew her brother Jason entirely in red, and there was no evidence whatsoever of his involvement or participation in the alleged one-time occurrence.
Dr. Mullin's testimony concerning the cause of J.H.'s slight vaginal inflammation was admittedly speculative, and although he found J.H. more inhibited during the exam than other children her age, he had never examined a child with her disabilities. The fact she witnessed sexual activity between her parents distinguishes her further from others her age, and this may have created in her a greater degree of awareness of her own sexuality which, in turn, may have been attended by a higher degree of modesty.
Although the State characterizes its evidence of sexual abuse of J.H. as "overwhelming and uncontradicted except by the general denials of the parents," the fact remains the foundation of the State's case was J.H.'s own statements, by way of her actions and signs, to her counsellor, Zimmerman, the investigator from the State's Attorney's office, Bergslien, and the expert witness, Robinson. Section 4-6(4)(c) of the Act provides:
"Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." (Ill. Rev. Stat. 1985, ch. 37, par. 704-6(4)(c).)
J.H.'s statements here were neither corroborated nor subject to cross-examination. The State was unable to elicit any substantive testimony from J.H. concerning the occurrence; on cross-examination by her father's attorney, she stated she wanted to go home to her mommy and *633 daddy and that her daddy did not do anything bad to her.
As to whether her statements were corroborated, we note a case on point, In re Custody of Brunken (1985), 139 Ill. App.3d 232. In Brunken, the State's case depended upon proof that the minor was abused by her father, and the minor's alleged out-of-court statements and actions to four other witnesses were the source of that proof. The State argued that the four witnesses who testified as to the minor's out-of-court statements and actions corroborated each other. The court stated:
"[W]hat must be corroborated is Kerry's [the minor's] statements which those witnesses interpreted as accusing her father of sexual abuse. We do not believe that two or more witnesses' testimony as to what the child said renders it more probable that the matters allegedly asserted by Kerry were true. In the somewhat analogous situation of criminal prosecution for indecent liberties, the victim's prompt complaint is considered corroborative of the victim's testimony in court. [Citation]. Testimony concerning the accused's admissions may serve as corroboration. [Citations.] However, once outside the ambit of prompt complaint, testimony regarding the victim's complaint is not considered corroboration of the victim's testimony. [Citation.] This principle is consistent with the general rule that a witness may not testify as to statements made out of court for the purpose of corroborating in-court testimony relative to the same subject. [Citation.] We conclude that the four witnesses who testified as to Kerry's alleged statements cannot be deemed to have corroborated each other." In re Custody of Brunken (1985), 139 Ill. App.3d 232, 239.
The State there also argued that "corroboration" was provided by the detail and "internal consistenc[y]" of the minor's statements as recounted by the four witnesses. The court viewed that such considerations provided no confirmation of the facts in issue:
"Whether Kerry's statements were consistent is precisely the sort of issue Barry [the minor's father] should have been allowed to pursue by cross-examination of the complaining witness according to section 4-6(4)(c). [(Ill. Rev. Stat. 1985, ch. 37, par. 704-6(4)(c).)] Absent cross-examination or corroboration, no conclusions can be drawn with respect to the detail or consistency of the child's statements." In re Custody of Brunken (1985), 139 Ill. App.3d 232, 240.
The court further found insufficient corroborative value in the testimony of the expert witness regarding the behavior of sexually abused *634 children, since such evidence in no way pointed to the father as the perpetrator of the abuse, there were other events which could have caused or contributed to the behavior in question (i.e., the parents' stormy divorce, and the child's removal from the home), and the occurrence of the behavior in question was part of the testimony of the minor's mother and grandmother which the court deemed was inferior to that from any independent source, since the father contended the proceedings were the mother's attempt to interfere with the visitation of the minor. Finding that the evidence fell short of the degree of proof required in section 4-6(4)(c), the Brunken court reversed the order adjudicating the child a ward of the court and dismissed the petition.
Following this reasoning, and based on the record before us, we conclude the evidence of the sexual abuse of J.H. adduced in this case also was insufficient to sustain an adjudication of wardship.
 6 We likewise find the court's dismissal of the petition was not against the manifest weight of the evidence presented on the issue of whether J.H.'s environment was injurious to her health.
As noted previously, allegations of physical and sexual abuse do not fall within the purview of the "injurious environment" provision of the Act. (Ill. Rev. Stat. 1985, ch. 37, par. 702-4(2)(b); In re Harpman (1986), 146 Ill. App.3d 504.) "Injurious environment" is set forth in section 2-4(2)(b) "as a species of abuse in contradistinction to the acts or physical abuse found in subparagraph (a) [of section 2-4(2)]." In re Harpman (1986), 146 Ill. App.3d 504, 511.
The State here attempted to prove that the child's home was unsanitary "in that bags of decaying organic garbage were about the living quarters, that insects did infest the living quarters, that animal feces and animal urine were on numerous areas of the floor, and that other unsanitary and dangerous conditions did exist in said living quarters." The evidence concerning garbage bags related to one incident at the minor's residence two or three years before the instant petition was filed, and there was no evidence the garbage bags contained organic material.
As to insects, the father testified that they had a problem with silverfish in the bathroom and that they had sprayed with Raid, which caused the cat to be sick. There was no testimony concerning animal urine on the floor, and the father testified that cat feces were the result of accidentally locking the cat out on the porch. Although the minor's grandmother testified there was an awful odor in the apartment, there was testimony from other witnesses that the condition of the apartment was normal, and that the family maintained a litter *635 box for the cat.
There was evidence that J.H. suffered from frequent bouts of bronchitis and croup, and that the father and at least one visitor, Aunt Sheryl, smoked in the apartment. Although common sense would seem to dictate that smoking should have no place in the environment of a person subject to respiratory ailments, there was no evidence of smoking other than these two occasions. Recognizing that an "injurious environment" is an amorphous concept and that each case should be decided on its own facts, we conclude the evidence here was insufficient to establish that the child's environment was injurious to her health.
We also find insufficient evidence of the other alleged abuses of J.H.  her absences from school, her lack of a hearing aid, the burns  to warrant her adjudication as a ward of the court. Although her absences were numerous, the only evidence they were caused by anything other than her illness was the time J.H. said that they visited a friend, and, thus, it was ostensibly an absence which was concurred in by her parents. As to the hearing aid, it appears the parents initially were unaware their daughter was deaf until she was tested at age two. There was no evidence adduced that the parents knew a hearing aid would be of any benefit to their deaf daughter. The personal hearing aids ultimately, albeit belatedly, secured with the assistance of the Lions Club did not enable J.H. to distinguish speech, but only made her aware of loud environmental noises and loud speech in her environment. Evidence that she did not have the hearing aids at school for several months, without more, is probative of nothing.
The accidental nature of the several burns sustained by J.H. was sufficiently established by the evidence  particularly the alleged deliberate one by virtue of J.H.'s father's testimony as corroborated by Jeanette Lawrence  and by one of the State's own witnesses, Cynthia Bane, who testified that none of the burns were of an abusive nature. Further, J.H.'s alleged statement that her father hurt her ear when he hit her with a toy truck was completely uncorroborated either by other independent evidence or by cross-examination of J.H.
In sum, we conclude that the court's judgment dismissing the petition was not against the manifest weight of the evidence.
Judgment affirmed.
HOPF and INGLIS, JJ., concur.