*In re* A.P. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellant, v. D.P. *et al.*, Respondents-Appellees).

Fifth District    No. 5—94—0861

Opinion filed August 30, 1996.

WELCH, J., concurring in part and dissenting in part.

Thomas Finks, State's Attorney, of Shelbyville (Norbert J. Goetten, Ste-

phen E. Norris, and J. Stephen Bennett, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

E.C. Eberspacher, of Dove & Dove, of Shelbyville, for appellees.

JUSTICE CHAPMAN delivered the opinion of the court:

On May 18, 1994, petitions for the adjudication of wardship were filed for the minor sisters A.P. and S.P. The petitions, filed pursuant to section 2—3 of the Juvenile Court Act of 1987 (705 ILCS 405/2—3 (West 1992)), allege that A.P., a nine-year-old female, in four counts, is an abused and neglected minor due to her father's inappropriate touching of her buttocks, anus, thighs, and/or vagina, and that S.P. is a neglected minor, in that her home environment is injurious to her welfare by virtue of the allegations of criminal sexual assault against her father. On September 14, 1994, the court conducted an adjudication hearing, and after the State presented its evidence, the court, on respondents' motion for "directed verdict," dismissed two of the four counts in the petition regarding A.P. At the conclusion of the hearing, the court denied the remaining two counts of that petition and dismissed the petition regarding S.P. The State appeals. We reverse.

Because the petition regarding S.P. is contingent upon the outcome of the petition regarding A.P., we shall only discuss the petition regarding A.P.

In 1994 nine-year-old A.P. slept in the upper one of the bunk beds in her room, and her four-year-old sister, S.P., slept in the lower one. During some early mornings of the first few months of 1994, A.P.'s father came into her room as he was leaving for work, and while everyone else in the house was asleep, he woke A.P., who was sleeping on her stomach,

(1) by rubbing her back, or

(2) by rubbing her buttocks through her clothes, or

(3) by pinching her buttocks through her clothes.

On five occasions in April of 1994, he woke her

(4) by pulling her pants down to at least below her buttocks and possibly to her knees, and

(a) pinching her bare buttocks,

(b) pinching her thighs,

(c) inserting his hand between her legs and rubbing her "private parts and/or crotch."

The conduct described in paragraph 1 through paragraph 4(b) is not seriously contested by the parents; they contest only the conduct described in paragraph 4(c), but there was evidence to support each of the listed acts. With this evidence before it, the trial court entered

judgments in respondents' favor on counts I and III, which alleged, as a part of the charge against the father, that he touched his daughter for the purpose of his sexual arousal.

■ Although the parties requested a directed verdict below and refer to the trial court's action as a directed verdict, the proper term in this case is "a motion for judgment." Although the term "directed verdict" is used interchangeably in jury and nonjury cases, to avoid confusion it should properly be reserved for jury trials, and the term "motion for judgment" should be used in nonjury trials (735 ILCS 5/2—1110 (West 1994)). The trial judge uses a different standard depending on whether it is a jury case or a nonjury case.

■ In a jury trial the motion for directed verdict is granted only where all the evidence viewed in a light most favorable to the opponent so overwhelmingly favors the movant that no contrary verdict can ever stand. 735 ILCS 5/2—1202 (West 1994); *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504 (1967). A motion for directed verdict in a nonjury trial is actually a motion for judgment (735 ILCS 5/2—1110 (West 1994)). In a nonjury case the trial judge applies a two-part test in ruling: first, the court determines whether the plaintiff has presented a *prima facie* case by presenting at least some evidence essential to each element of the cause asserted; if so, the court must weigh evidence, pass on the credibility of witnesses, draw reasonable inferences, and generally consider the weight and quality of evidence. *In re Estate of Kirk*, 242 Ill. App. 3d 68, 611 N.E.2d 537 (1993). Note that throughout this opinion we will refer to the trial court's decision as a grant of a motion for judgment.

The basis of the trial court's decision to grant the motion for judgment is not completely clear, but it was apparently because the judge felt:

(1) that the State had not proved by a preponderance of the evidence that the father's use of these methods to awaken his daughter was for the purpose of his sexual arousal, because no one testified to that fact, or

(2) that because A.P. partially recanted at trial when she stated she had not understood that the words "private parts and crotch" referred to her vaginal area, the judge was precluded from considering the testimony of the four people to whom A.P. had consistently indicated that her father had rubbed her vaginal area when he inserted his hand between her legs.

The trial court's ruling may also have been based on a combination of (1) and (2), but whether it was based on (1) or on (2) or on a combination of them, it was mistaken.

■ Turning to basis number one, the question is whether the

State must produce testimony or other direct evidence that the actor's conduct was performed for the purpose of his sexual arousal. The trial court was obviously concerned with this point because it stated, "Well, they [counts I and III] have an additional element to them." The guardian *ad litem* stated: "[F]or the purpose of sexual arousal of the father as contained In Counts I and III ***, we don't have any evidence of that particular element on these particular counts. *** [W]e have absolutely no evidence in front of us regarding the issue of sexual arousal. I do think it would be appropriate at this time, even in the light most favorable to the State, to dismiss Counts I and III on a Motion of Directed Verdict [*sic*]." Then the court ruled, "I cannot find sufficient evidence as to Counts I and II [*sic*] alleging sexual abuse to allow this to go forward."

The parts of the record just quoted suggest that the trial court relied upon the guardian *ad litem*'s statement of the fact that there was "absolutely no evidence" that the father's conduct was for the purpose of his sexual arousal. Although the guardian *ad litem*'s statement would be accurate if it were limited to *direct* evidence, it is certainly not accurate in terms of all the evidence presented in this case. To put it simply, it is not necessary for anyone to testify that the father had an erection, that the father was fondling himself, or that the father was leering, drooling, or moving in a sexually suggestive way. In other words, it is not necessary for the State to present *any direct* evidence of "for the purpose of sexual arousal"; that element of the charge can be inferred from the conduct itself. See *People v. Balle*, 234 Ill. App. 3d 804, 601 N.E.2d 788 (1992). In this case, can anyone believe, if it was true that the father pulled his sleeping daughter's pants down, pinched her bare buttocks, and inserted his hand between her legs and rubbed her "private parts" or "crotch" on four or five separate occasions, that he was *not* doing these acts for the purpose of his sexual arousal? Most people would not believe that this was really just "benign conduct" or an acceptable alternative way of waking a hard-to-wake child.

Our decision, however, is not based on our belief, or lack of belief, in the version of facts presented by the parents; it is based on what the law requires. In the criminal area, direct evidence of "purpose of conduct" is not required. *Balle*, 234 Ill. App. 3d 804, 601 N.E.2d 788. Certainly, if such a purpose can be inferred in a criminal case where the defendant's liberty is at stake, it is equally proper to infer it when a nine-year-old child's protection is at stake.

At this time we note that there may have been some confusion as to the guardian *ad litem*'s role in these types of proceedings. Before June 24, 1993, the statute was silent as to the guardian *ad litem*'s re-

sponsibilities toward the State's Attorney, the respondents, the court, and the minor. After that date, however, the statute made it clear that the guardian *ad litem* "shall represent *the best interests of the minor* and shall present recommendations to the court consistent with that duty." (Emphasis added.) 705 ILCS 405/2—17(1) (West Supp. 1993). It may be that the recent change in the statute explains the guardian *ad litem*'s statement to the court about the lack of evidence to support counts I and III. The same reason may explain the following question posed to the respondent's expert by the guardian *ad litem*:

> "Q. If a father *benignly* goes to his nine-year-old child in the morning while she is asleep, pulling down her panties and pinching her on the buttocks, is that conduct which you would and, again, *the intention would be to wake her up*, is the conduct either possibly neglectful, is it sexually abusive, or is it *just benign conduct*?" (Emphasis added.)

The State's objection to the form of that question was sustained, and it is included here not because it resulted in a meaningful response, but because the very phrasing of the question is another manifestation of the guardian *ad litem*'s attitude in this case. Remember that this is a question asked by the guardian *ad litem* on *cross-examination* of an expert called by the *father*. Why then is the question phrased in terms of "benignly going to his nine-year-old daughter," with the "intention *** to wake her up"? These are the *father's* contentions. It does not appear to us that the best interests of the child were represented by this question by the guardian *ad litem*.

The second possible basis of the trial court's decision to grant the motion for judgment on counts I and III was that it felt it could not consider all the testimony of the four witnesses who related A.P.'s complaints to the court because she had partially recanted. In this case there is no question that respondent had the opportunity to cross-examine the minor. The trial court went to great pains to insure this protection. Respondent, however, contended that the second sentence of section 2—18(4)(c) of the Juvenile Court Act of 1987 (705 ILCS 405/2—18(4)(c) (West 1994)) required both that the minor's statement be corroborated and that the minor be subject to cross-examination. In *In re Custody of Brunken*, this court held:

> "We find this a tortured reading of the statute, which states the two requirements in the disjunctive. Had the legislature intended that out-of-court statements be deemed insufficient proof of neglect or abuse unless the statements were corroborated *and* the child subject to cross-examination, the legislature could have said

so in plain language." (Emphasis added.) *In re Custody of Brunken,* 139 Ill. App. 3d 232, 238, 487 N.E.2d 397, 401 (1985).

Since A.P. was subject to cross-examination, at least one prong of section 2—18(4)(c)'s requirements was met for all her statements. Therefore, there was sufficient evidence to withstand the motion for judgment, and the trial court erred in allowing the motion as to counts I and III.

Our conclusion on this point is buttressed by the fact that A.P. repeatedly told a consistent version of the events. In summary, she told:

(1) a school counselor,
(2) her school teacher,
(3) a DCFS investigator,
(4) a police officer, and
(5) her mother,

that her father had touched her on her back and buttocks on approximately 30 occasions through her clothes and that, on four or five occasions, he had touched and/or pinched her bare buttocks and put his hand between her legs and rubbed her "private parts and/or crotch."

It is significant that A.P. volunteered her initial complaint to the school counselor. A nine-year-old child volunteered to a relative stranger that her father had touched her repeatedly in an intimate way, events that could not have been easy for her to disclose and describe.

It is also important that these same events were described by the child in a consistent manner to five different people on four different occasions. There was no inconsistency in any of the reports; A.P. used both a diagram and a doll to show the area that her father had touched. Although it is true that A.P. did not use the word "vagina," it is not the word that is important; what is important is the area of the body touched, and her use of the diagram and the doll clearly indicated the area of her body that she said her father invaded.

When did any inconsistency develop? Was it when A.P. related the events for the second time, that is when she told her teacher? No, she told her teacher the same thing. Was it when she told it the third time, to the DCFS investigator and her mother? No, she related the same facts then. What about the fourth time, when she told it to the police officer? No, again she described the same events.

When did this different story develop? When did this inconsistency about the meaning of "private parts" and "crotch" manifest itself in the mind of this nine-year-old straight-A student? Did her mother discuss these terms with her while the DCFS investigator or

the police officer were interviewing her on the day of the original complaint? No, not then. Two days later there was a meeting. What sort of a meeting was it? Did her mother sit down alone with her at a quiet time to clear up any misunderstanding? No, it wasn't quite like that. The meeting wasn't between just A.P. and her mother. Who was there? A.P. and her mother, of course. Anyone else? A.P.'s older sister. Anyone else? A.P.'s grandmother. Anyone else? A.P.'s grandfather. Anyone else? A.P.'s aunt. Anyone else? A.P.'s uncle by marriage.

Is it any wonder that A.P., when faced with this array of adults, and when her mother told her, in essence, that "This is what I mean by private parts; now is that what you meant by them, too?", would change the meaning of "private parts" to one that was more acceptable to her father's position? Although a great deal of deference is due to the trial court in a case of this type, and although it is clear from the record that the trial judge was concerned about the charges, the alleged conduct, and their effect on A.P., the factual situation presented by this case is extremely troublesome.

With regard to the trial court's rulings on counts II and IV, we cannot find that the trial court erred. On remand, the trial judge is to consider the evidence presented in light of this opinion. He is not, however, limited to the evidence in this record to date. If, in the exercise of his discretion, he determines that further evidence is needed, either from lay or expert witnesses, he is free to receive it. Obviously, the respondents are entitled to present evidence on their behalf also.

As we indicated at the beginning of this opinion, the result in S.P.'s case depends upon the result in A.P.'s case. Obviously, our reversal of the decision on the counts regarding A.P. carries with it a reversal of the decision on the counts regarding S.P.

Affirmed in part and reversed in part; cause remanded.

MAAG, J., concurs.

JUSTICE WELCH, concurring in part and dissenting in part:
I respectfully dissent. In close cases, it is not the function of this court to substitute its interpretation of the evidence for that of the trial court, which is in a far superior position to evaluate. *Sohaey v. Van Cura*, 240 Ill. App. 3d 266, 293, 607 N.E.2d 253 (1992).

The majority gives two possible reasons why it believes the trial court erred in granting the motion for judgment: (1) because the trial court relied on the fact that no one testified that the father's method

of waking his daughter was for the purpose of his sexual arousal; and (2) because the trial court felt it was precluded from considering the testimony of the four people to whom A.P. had consistently indicated that her father had rubbed her vaginal area when he put his hand between her legs.

Turning to the second of these two reasons first, there is nothing in the record to support this notion. It is not stated anywhere in the record or in the appellant's brief that the trial court did not consider the testimony of these four witnesses. Absent a contrary indication in the record, we must presume that the trial court acted properly and did not preclude itself from considering this testimony. *In re Estate of Friedman*, 123 Ill. App. 3d 82, 462 N.E.2d 692 (1984).

With respect to the first reason, there again is nothing in the record which indicates that the trial court limited its decision only to direct evidence. The trial court stated that there was not "sufficient evidence" of the father's intent for sexual arousal; nowhere does the court indicate that this decision was based only on direct evidence, and nowhere can it be found that the trial court did not consider the surrounding circumstances.

Upon a thorough review of the direct and circumstantial evidence presented in the record, I cannot agree that the trial court's decision that there was not sufficient evidence to support an intent for sexual arousal is against the manifest weight of the evidence. The majority claims that its decision to reverse is based upon what the law requires; yet, the majority fails to set out how the circumstances show that the alleged touching was for the purpose of sexual arousal. The majority's conclusion rests upon a one-sentence analysis: "In this case, can anyone believe, if it was true that the father pulled his sleeping daughter's pants down, pinched her bare buttocks, and inserted his hand between her legs and rubbed her "private parts" or "crotch" on four or five separate occasions, that he was *not* doing these acts for the purpose of his sexual arousal?" 283 Ill. App. 3d at 398. I would tend to agree with this statement, if it were true, but it is not clear from the record whether *any* touching occurred. The trial court is in the best position to make this determination, and absent the manifest weight of the evidence pointing otherwise, that decision must stand.

Putting on hold the issue of whether any touching occurred, the State must show more than a mere touching to establish an intent of sexual arousal. Some circumstances which show that a touching was done for the intent of sexual arousal include whether the defendant had an erection, what the defendant did and said during the touching, the duration of the touching, whether the touching was clearly

deliberate, and where and how the touching occurred. *People v. Smith*, 236 Ill. App. 3d 35, 603 N.E.2d 562 (1992); *People v. Balle*, 234 Ill. App. 3d 804, 601 N.E.2d 788 (1992); *People v. E.Z.*, 262 Ill. App. 3d 29, 633 N.E.2d 1022 (1994); *People v. Goebel*, 161 Ill. App. 3d 113, 514 N.E.2d 60 (1987); *People v. Kelchner*, 221 Ill. App. 3d 25, 581 N.E.2d 793 (1991). In this case, the State did not introduce any evidence of circumstances which support the conclusion that the touching was for the purpose of the father's sexual arousal.

The uncontested evidence of the circumstances surrounding the touching is as follows: the touching only occurred in the early morning hours as A.P.'s father attempted to wake her for school; A.P. was a heavy sleeper; while her father touched A.P., he would say "wake up"; and once A.P. awoke, the father would stop. There is no evidence that this touching occurred at any other time of the day. There is no evidence of insertion. Most importantly, there is no evidence as to the duration of the touching, such as whether it lasted for more than a couple seconds or less than a very brief instant. From the first time A.P. told her story, to when she told the school counselor, to when she told the DCFS investigator, to when she spoke to the police officer, she consistently maintained that she thought the touching may have been accidental. Based upon these circumstances, I cannot say that it is clearly evident that the touching was not accidental but that it was for the purpose of the father's sexual arousal.

Now, returning to whether there was a touching of the "crotch" or "private parts," based on the record, I cannot agree with the majority that the evidence clearly indicates the area of the body that A.P.'s father "invaded." The State's witnesses testified that A.P. alleged that she was touched in her "crotch" or "private parts." However, A.P. herself testified that her father was never within four inches of her vagina. Further, A.P. testified that the State's witnesses did not understand what she meant when she said "crotch" or "private parts." The State's witnesses acknowledged that they never defined "private parts" or "crotch," and that they never used anatomically correct dolls or diagrams. In fact, A.P.'s counselor testified that she taught the children that their private parts are the "area covered by your underwear."

The trier of fact is in the best position to observe the witnesses demonstrate how A.P. described the touching, to observe the demeanor of the witnesses, to determine the credibility of the witnesses, and to determine how much weight to give their testimony. *In re J.H.*, 153 Ill. App. 3d 616, 630, 505 N.W.2d 1360 (1987). It is not within our province to substitute our interpretation of the evidence for that of the trial court merely because we find it "troublesome." *In*

*re J.H.*, 153 Ill. App. 3d at 630. The trial court noted in its findings that it was "not very impressed by the degree of accuracy in the investigation."

In addition, it is glaringly apparent that the majority substituted its own interpretation of the record for that of the trial court. The majority described the father as touching A.P. in an "intimate" way. However, nowhere in the record is the touching ever described as "intimate." The majority also states, "[A.P.'s] use of the diagram and the doll *clearly* indicated the area of her body that she said her father invaded." (Emphasis added.) 283 Ill. App. 3d at 400. The trial court observed A.P. and the witnesses demonstrate the alleged "touching." We do not have the privilege of observing their demonstration. We cannot see A.P. or the witnesses touch the doll, nor can we see specifically where they pointed to on the diagrams. How the majority can see that the use of the doll *clearly* indicated where the touching occurred is astounding. Finally, the majority states, "Is it any wonder that A.P., when faced with this array of adults *** would change the meaning of 'private parts' to one that was more acceptable to her father's position?" 283 Ill. App. 3d at 401. As I mentioned earlier, the true meaning of what A.P. meant by "private parts" and "crotch" was never determined by the investigators; therefore, it is unclear whether it was ever changed or just misunderstood.

Therefore, for the foregoing reasons, I dissent from the majority's reversal as to counts I and III, but I agree with the majority on the remaining two counts.