*In re* CUSTODY OF KERRY BRUNKEN, a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Barry Dean Brunken, Respondent-Appellant).

Fifth District   No. 5—84—0713

Opinion filed December 19, 1985.—Rehearing denied January 17, 1986.

Frank H. Byers, of Byers, Byers & Greenleaf, of Decatur, for appellant.

Richard A. Runde, State's Attorney, of Effingham (Kenneth R. Boyle,

Stephen E. Norris, and Julianne Cordts, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

No brief filed for Kendra Brunken.

JUSTICE WELCH delivered the opinion of the court:

The proceeding in question concerns the custody of Kerry Beth Brunken, a minor. The circuit court of Shelby County dissolved the marriage of her parents, Barry Dean Brunken and Kendra Sue Brunken, by judgment of July 21, 1981. In that judgment, Kendra Brunken received custody of Kerry. On January 31, 1983, Mr. Brunken filed his petition in the circuit court of Shelby County for a rule to show cause why the Department of Children and Family Services (DCFS) should not be held in contempt for interfering with visitation. DCFS then filed its petition in the circuit court of Effingham County for adjudication of wardship. The circuit court of Effingham County adjudicated Kerry a ward of the court, granted custody to Mrs. Brunken, and granted Mr. Brunken limited visitation under supervision. Mr. Brunken appeals, requesting that this court either enter judgment denying the petition for adjudication of wardship, or remand this cause with directions that it be transferred to Shelby County and heard anew.

Barry and Kendra Brunken's marriage was dissolved on July 21, 1981. The decree provided that Kendra should have custody of Kerry. Barry continued to reside in the marital home, which his parents Garold and Jean Brunken owned. Barry was granted extensive visitation in the decree, including three three-day periods during each month. On January 28, 1983, Carol Lance, a DCFS social worker, informed Barry by telephone that Barry was not to visit Kerry without supervision. On January 31, 1983, in the circuit court of Shelby County, Barry filed his petition for a rule to show cause why DCFS should not be held in contempt for interfering with the visitation provisions of the decree of dissolution. On February 10, 1983, in the circuit court of Effingham County, Lance filed the petition for adjudication of wardship on behalf of DCFS, alleging that Barry had sexually abused Kerry. All subsequent proceedings referred to herein were in the circuit court of Effingham County.

DCFS took protective custody of Kerry on February 11, 1983, though Kendra retained physical custody. On February 14, 1983, a shelter care hearing was held without notice to Barry. On April 12 he filed his motion to set aside the original shelter care hearing. On May 25 he filed his motion for mental examination of Kendra and Kerry.

Kerry, Kendra and Barry were psychologically evaluated on June 29, 1983. The resulting report, filed November 14, 1983, stated the evaluators' inability to determine whether or not sexual molestation occurred, but concluded that Barry should not be permitted unsupervised visits with Kerry "on the possibility molestation has occurred or may recur."

The adjudicatory hearing was held on December 1, 1983, and March 22, 1984. Witnesses for DCFS on the initial date included Kendra Brunken, her mother Beverly Moore, DCFS social worker Carol Lance, and counselor Judy Latta. The critical portion of the testimony of Kendra Brunken and of Moore, Lance, and Latta concerned Kerry's out-of-court statements and actions. Kerry was not examined during any of the proceedings in question.

Kendra Brunken testified as follows: She first noticed something unusual about Kerry's behavior in the fall of 1982; "she didn't want to go back to her dad's. She was clinging to her blanket more. When she got home she seemed more upset." Then, about January 1, 1983, Kendra was drying Kerry with a towel when Kerry said "Mommy, be gentle with me," a phrase Kendra had not heard her use before; Kerry also indicated her vaginal area by pointing. On or about January 19, 1983, Kendra was putting a diaper on Kerry when, "out of the clear blue," Kerry said, "Daddy sticks his finger in my bottom." According to Kendra, Kerry referred to her vaginal area as her "bottom." On or about February 26, 1983, Kendra observed Kerry in the bathtub, playing with a plastic knife and half of a plastic egg; Kerry was poking these items in and around her vaginal area; Kendra told her not to; Kerry said: "Well, daddy does like that." Also in February 1983, while Kendra and Kerry were in Kendra's automobile, Kerry said "out of the clear blue": "Only bad people hurt people, don't they?" Kendra told her that was right; Kerry said: "Only bad people hurt people with puzzle pieces?" Kendra asked if she knew anyone who does that; Kerry replied: "Daddy does." In the fall of 1982, Kerry and Kendra were watching television when Kerry "passionately" kissed Kendra, putting her mouth over Kendra's mouth and "around" Kendra's face; Kendra asked Kerry if she had learned this watching television; Kerry said no, from daddy. At about this time Kerry's vaginal area was very red, and Kerry was reluctant to be touched there; previously she was not reluctant to be touched. On a "couple" of occasions Kerry said: "Daddy tickles me with his finger," pointing to her vaginal area. In September of 1983, in the bathroom, Kerry complained of her "bottom" hurting, then said: "Daddy hurts my bottom." Kerry had seen Barry only once since the February 14,

1983, shelter care hearing; in that time Kerry had stopped clinging to her blanket, had stopped wetting her clothes and had decreased her bedwetting, did not seem so upset, and had ceased being reluctant to talk about her father.

Mrs. Moore testified as follows: In the fall of 1982 she was putting a diaper on Kerry when Kerry recited a variation of the nursery rhyme "Hickory Dickory Dock," as follows: "[T]he clock struck one and daddy put his hand in my pants." Another time, during a bath, Kerry said; "I take baths with daddy in the shower and daddy hurts me." Another time, being dressed after bathing, Kerry said: "Be gentle with me."

Carol Lance testified as follows: She interviewed Kerry in Kendra's home on January 21, 1983. Kerry told her "that daddy stuck his fingers and put wooden puzzle pieces into where she pee pees and poo poos," and Kerry pointed to those areas. Kerry also said that daddy kissed her on her chest and belly and had her kiss him on the same areas, and that she showered and slept with him. Using anatomically correct dolls which Lance had brought with her, Kerry demonstrated: Kerry picked up a puzzle piece with the hand of the adult male doll and "crammed it" into the female child doll, first in the vaginal area, then the anal area. "Then she took her own finger and stuck her finger into the vagina and into the anus and said this is what daddy does to me." There was no prompting or suggesting by Lance. Kerry then laid the female doll on the floor "and took the male doll *** and said daddy does this and I said what is that that daddy is doing and she said daddy is kissing me on the, my belly and on my chest." Later Kerry reversed the positions of the dolls and "said I am kissing daddy on his belly." Kerry brought up the subject of sex with her father herself.

Judy Latta testified as follows: She had counseled or interviewed Kerry eight times thus far. On the first occasion, January 26, 1983, Latta told Kerry she wanted to talk about whether she had ever been touched by anyone in a way she didn't like. Latta showed Kerry a "stick drawing" of a person, asked her to pretend it was she, and asked her if anyone had touched her. Kerry pointed "between the drawing's legs and said that her daddy had touched her there." In Latta's opinion children of any age did not make up stories of sexual abuse. There were "red flags" of sexual abuse which people in her field looked for, such as increase or recurrence of bedwetting, a recurrence in needing a favorite object, or other behavioral changes.

Testimony at the resumption of the adjudicatory hearing on March 22, 1984, was as follows:

Pediatrician Donnelly Foster testified that she examined Kerry twice in January, 1983, once for signs of sexual abuse, the second time to test for gonorrhea; no signs of sexual abuse were found. However, she referred Kerry to Judy Latta for counseling, preferring to err on the side of protecting the child.

Psychotherapist Robert Beechdale, of the Child Abuse Treatment and Training Center of Illinois, testified for DCFS as an expert witness. He did not examine or interview Kerry. Beechdale testified as follows: Based on about 400 cases seen by the Center, children who report sexual abuse are rarely found to have lied. Signs of a sexually abused child included recurrence of bedwetting, excessive masturbation, sensitivity to touch, and an overdeveloped sense of privacy. Typically the accused parent would either deny the occurrence or its significance. Typically the child would want to spend time with the abusing parent. Children abused as early as age three do not forget, though they may try to. In most cases in which a child reports sexual abuse, the perpetrator ultimately admits his guilt, the exceptions being less than 10 of the 400 cases seen by the Center.

Evidence for Barry Brunken was as follows: John House, a DCFS social worker testified: He interviewed Barry on January 28, 1983. Barry denied any sexual contact with Kerry, though he admitted bathing her. He could not explain Kerry's stories. Barry characterized Kerry as affectionate, but did not understand the reference to passionate kisses. Barry accused Kendra of fabricating the incidents to prevent his visiting with Kerry; he offered to submit to polygraph examination. In House's opinion Barry's reactions were appropriate; Barry did not appear nervous or guilt-ridden; his answers were consistent despite attempts to confuse him; even when pressed, Barry remained calm and answered all questions. Based on the 30 to 45 minute interview, House expressed doubts whether the allegations against Barry were true.

Jean and Garold Brunken, Barry's parents, each testified that Kerry was at their home on every day of visitation; Kerry never complained about her father to them; they had no suspicion that anything was amiss. Jean Brunken described Kerry's conduct as much like her own daughters' when they were growing up.

Barry testified in his own behalf as follows: He never had sexual contact of any kind with Kerry. He owned no wooden puzzles. Kerry never complained prior to January 21, 1983, nor had anyone else. He had seen her twice since, once at Christmas for a few hours, the other time at the psychological evaluation. He first learned of the accusations from Mr. House. On cross-examination, Barry admitted that he

and Kerry occasionally showered and slept together. He knew of no one else she called "daddy." He did not believe that Kerry made up the accusations, but he could not explain them.

At the close of the adjudicatory hearing, the court found the petition for adjudication of wardship proved by a preponderance of the evidence. The court granted custody of Kerry to DCFS.

The following occurred at the August 10, 1984, dispositional hearing:

Judy Latta testified as follows: In her opinion Barry should not have unsupervised visits with Kerry unless Barry was being counseled and his counselor pronounced him ready. Being separated from her father for almost a year was almost more traumatic for Kerry than the abuse. Latta recommended that Barry confess his guilt to Kerry and pledge her his support. Latta admitted that she had never talked with Barry or his parents.

Barry persisted in denying that the abuse occurred, but agreed to accept counseling.

After the dispositional hearing, the court ordered increased visitation for Barry on the condition that Jean and Garold Brunken personally supervise all visits.

■ Section 4—6(4)(c) of the Juvenile Court Act provides: "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." (Ill. Rev. Stat. 1983, ch. 37, par. 704—6(4)(c).) The State argues that the instant evidence was sufficient to prove abuse under the second sentence of section 4—6(4)(c) because Kendra Brunken and Moore, Lance, and Latta were cross-examined at the adjudicatory hearing. We reject that construction of section 4—6(4)(c); what section 4—6(4)(c) plainly calls for is cross-examination of the minor.

■ Barry Brunken argues that the second sentence of section 4—6(4)(c) requires both that the minor's statements be corroborated and that the minor be subject to cross-examination. We find this a tortured reading of the statute, which states the two requirements in the disjunctive. Had the legislature intended that out-of-court statements be deemed insufficient proof of neglect or abuse unless the statements were corroborated and the child subject to cross-examination, the legislature could have said so in plain language.

■ We turn to Barry's contentions that the adjudication of wardship rests solely on the uncorroborated out-of-court statements of Kerry, and that the evidence was insufficient to support the finding of

abuse. The trial court's determination of neglect will not be disturbed unless contrary to the manifest weight of the evidence. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 336, 379 N.E.2d 872, 879.) The State advances several sources of corroboration. We have found no cases indicating what is sufficient corroboration under section 4—6(4)(c). However, "corroborate" has been defined as "to add weight or credibility to a thing by additional and confirming facts or evidence." (Black's Law Dictionary 414 (4th ed. 1951).) What facts or evidence will serve as confirming or corroborative facts will necessarily vary depending on the facts to be corroborated. In the instant case the issues of fact are whether Kerry was abused, and, if so, who was the abuser. The State's case depends on proof that Kerry was abused by her father. Kerry's alleged statements are the source of that proof. In this case, then, corroboration must take the form of some independent evidence which in light of Kerry's statements makes it more probable that Kerry was sexually abused by her father.

First, the State argues that the four witnesses who testified as to Kerry's out-of-court statements and actions corroborated each other. However, what must be corroborated is Kerry's statements which those witnesses interpreted as accusing her father of sexual abuse. We do not believe that two or more witnesses' testimony as to what the child said renders it more probable that the matters allegedly asserted by Kerry were true. In the somewhat analogous situation of a criminal prosecution for indecent liberties, the victim's prompt complaint is considered corroborative of the victim's testimony in court. (*People v. Sprouse* (1981), 94 Ill. App. 3d 665, 673, 418 N.E.2d 1070, 1076.) Testimony concerning the accused's admissions may serve as corroboration. (*People v. McMillan* (1980), 86 Ill. App. 3d 208, 212, 407 N.E.2d 207, 211; *People v. Wendt* (1969), 104 Ill. App. 2d 192, 202, 244 N.E.2d 384, 389.) However, once outside the ambit of prompt complaint, testimony regarding the victim's complaint is not considered corroboration of the victim's testimony. (*People v. Pazell* (1948), 399 Ill. 462, 468-69, 78 N.E.2d 212, 215.) This principle is consistent with the general rule that a witness may not testify as to statements made out of court for the purpose of corroborating in-court testimony relative to the same subject. (*People v. Bonds* (1980), 87 Ill. App. 3d 805, 812, 410 N.E.2d 228, 234.) We conclude that the four witnesses who testified as to Kerry's alleged statements cannot be deemed to have corroborated each other.

Next, the State argues that corroboration was provided by the expert witnesses' testimony regarding the behavior of sexually abused children. The value of expert testimony depends upon the

facts and reasons which form the basis of the expert's opinion. (*Brendel v. Hustava* (1981), 97 Ill. App. 3d 792, 799, 423 N.E.2d 503, 509.) Here the experts testified generally that a sexually abused child might cling more to his or her blanket or other favorite object and might have a recurrence of bedwetting or an increased need for privacy. Kendra Brunken and Mrs. Moore testified, again generally, that Kerry clung to her blanket more and regressed in bedwetting. The problems with this evidence as corroborating evidence of sexual abuse are many. First, in no way does it point to the father as the perpetrator. Second, it is a questionable indicator of sexual abuse when one considers the stress upon the child caused by her parents' stormy divorce and physical separation, and the child's physical removal from the marital home, all at a tender age. Third, while the experts testified as to what behavior to look for, the actual occurrence of such behavior on Kerry's part was the subject of testimony only by Kendra Brunken and her mother, and thus form a part of the very statements sought to be corroborated. Finally, in view of Barry's adamant denials and his contention that the proceedings are Kendra's attempt to interfere with visitation, corroboration from Kendra's mouth and her mother's must be deemed inferior to corroboration from any independent source.

■ The State also argues that "corroboration" was provided by the detail and "internal consistence" of Kerry's statements as recounted by the four witnesses. In our view such considerations provide no confirmation of the facts in issue. Whether Kerry's statements were consistent is precisely the sort of issue Barry should have been allowed to pursue by cross-examination of the complaining witness according to section 4—6(4)(c). Absent cross-examination or corroboration, no conclusions can be drawn with respect to the detail or consistency of the child's statements.

The State also suggests as corroboration: "Mr. Beechdale's testimony confirmed that the respondent's behavior was typical of a parent who has sexually abused his child. The typical response of such a parent, when questioned as to whether they have sexually abused their child, is to deny the fact of abuse. Further, it is not atypical for the child who has been sexually abused to want to spend time with the abusing parent." This remarkable argument refutes itself and illustrates the weak factual support the State has offered here as confirmation for the statements attributed to the child.

■ Several of the State's arguments in support of the orders appealed from are coupled with the observation that the Juvenile Court Act's primary purpose is the protection of the child. (See *In re Stilley*

(1977), 66 Ill. 2d 515, 520-21, 363 N.E.2d 820, 822.) In the instant case the child has neither requested nor sought to be separated from her father. She has not appeared in court. The father has consistently denied all wrongdoing and sought to regain normal visitation. Parent and child have an inherent and valuable right to each other's society. (See *In re Prough* (1978), 61 Ill. App. 3d 227, 232, 376 N.E.2d 1078, 1082.) In our view, the second sentence of section 4—6(4)(c) shows our legislature's recognition of that right. We are of the opinion that the evidence adduced in this case falls short of the degree of proof required in section 4—6(4)(c), and further that that evidence does not support the instant adjudication of wardship. Accordingly, we reverse.

For the foregoing reasons, the order of the circuit court of Effingham County adjudicating the child a ward of the court is reversed; the petition for adjudication of wardship is dismissed.

Judgment reversed; petition dismissed.

KARNS and HARRISON, JJ., concur.