*In re* MARCUS E. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Melody E. *et al.*, Respondents-Appellants).

First District (4th Division)   Nos. 1—85—2134, 1—86—2836 cons.

Opinion filed May 18, 1989.

---

*Justice McNamara participated in this opinion prior to his assignment to the sixth division.

694

James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellant Melody E.

Murphy Law Firm, of Chicago (Sheila M. Murphy, of counsel), for appellant Mervyn E.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Aaron Iverson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

This appeal arises out of an adjudication for wardship in which two minor children were removed from the home of their parents pursuant to certain provisions of the Juvenile Court Act. (Ill. Rev. Stat. 1983, ch. 37, pars. 702—4(2), 705—1, 705—7.) The case against the father, Mervyn E., was premised on allegations that he sexually abused both children. The mother, Melody E., was charged with allowing the abuse to occur and possibly participating in the abuse. After an evidentiary hearing, the trial court found that both children had been abused and that the environment should be deemed injurious to their welfare. While the children were in foster care the mother was allowed one hour of supervised visitation every two weeks and the father was initially denied visitation. After an additional hearing, the court reinstated the father's visitation rights and required him to receive therapy. The mother's motion for a new trial, based on newly discovered evidence, was denied. Both parents appeal, challenging the nature and extent of the evidence and the constitutionality of the provision of the Juvenile Court Act that they were charged with violating.

For the reasons that follow, we affirm the trial court's findings concerning the father, reverse the finding of abuse as against the mother, and affirm the dispositional ruling.

BACKGROUND

The initial complaint of possible sexual abuse originated in Oregon, where the mother and children had temporarily stayed with relatives. The mother's sister reported that five-year-old Marla told her that the father had molested her while giving her baths. Although the written charge included an allegation of medical neglect and sexual intercourse, neither of these was established. The Illinois Department of Children and Family Services (DCFS), after notification by its counterpart in Oregon, filed a petition for wardship on February 28, 1984.

The following facts were brought out at the trial of the wardship petition.

THE STATE'S CASE

On February 14, 1984, Robert Granger, a social worker for the Illinois Department of Children and Family Services, visited the family's Chicago home, which was owned by the father's aunt, and spoke briefly with the parents. He set up an interview for the following day. The children appeared active and he saw no indication of medical neglect.

Gabriella Cohen, executive director of HELP, Inc., an agency which evaluates and treats persons allegedly involved in child sexual abuse cases, met the mother on February 15 at the police station. Cohen, who is also a member of several governmental task forces on sexual abuse, interviewed the mother and children and arranged for them to stay at a shelter.

At trial, defense counsel objected to Cohen's relating what the children told her, arguing that section 4—6(4)(c) of the Juvenile Court Act was unconstitutional in permitting such hearsay testimony. The objection was overruled.

According to Cohen, Marla told her that in December 1983, before her mother took her and Marcus to Oregon, her father sat in the bathtub with her and rubbed her nipples and "pee-pee" (vagina). Marla, who was then four years old, told Cohen that her father had done this on several prior occasions.

Cohen showed Marla a coloring book which Cohen had helped develop for questioning children in sex abuse cases. On one page there were pictures of animals with explicitly depicted genitalia. Marla identified the vaginal opening of a raccoon as a "pee-pee." Defense counsel unsuccessfully objected to the use of the pictures because Cohen had not been qualified as an expert in using the materials to question children or interpret their answers and because the materials were not of established reliability.

Cohen testified that she showed Marla four figures on a "phallus chart." The first figure was a long squiggly thing, which Marla said looked like an elephant. The second was short and bumpy, and Marla did not know what it represented. The third figure resembled a non-erect penis and the fourth, a fully erect penis. Cohen testified that Marla said the third picture looked like her "daddy's pee-pee before he played with [her] pee-pee" and the fourth looked like his penis after she rubbed his "pee-pee."

Cohen acknowledged that the book she used to question the children was not standardized and that its reliability had not been established at the time of trial.

Cohen further testified that Marcus, the seven-year-old son, told her on February 15 that his father had hit him seven times on the penis for opening his sister's Christmas present. He also said his father hit him "upside the head a lot."

Cohen also interviewed the mother on February 15, 1984. Cohen said the mother told her that she was frightened when she found out about her husband's abuse of the children and that is why she took them to her sister's house in Oregon. She told Cohen that her hus-

band hit Marcus often and that she was afraid to return to her husband's aunt's house in Chicago. Over objection, Cohen was allowed to testify that the mother told her that her husband had told her he "liked" children and that she was "too old" for him.

Later in the same day that Cohen initially interviewed the mother and children, Robert Granger, the DCFS social worker, talked to the mother. She told him that she had gone to Oregon in December 1983 because her husband had treated Marcus unfairly by severely punishing him and because her husband made her feel "low."

On February 27, 1984, Cohen again interviewed Marla. Marla repeated essentially the same allegations. The mother, however, told Cohen that Marla's Uncle Denny, who lived in Oregon, was probably the person who had molested Marla and that Marla was being misunderstood by saying "daddy/Denny." Upon Cohen's questioning, Marla responded that Uncle Denny would give her baths at night and "do the same thing." As a result, the DCFS sent a report back to the same Oregon department from which the original report of abuse had been initiated by Denny's wife, who is the sister of the children's mother.

Marla had been called as a witness in the criminal proceeding that had been initiated against her father. In that proceeding, she stated both that her father did nothing to her and that she did not remember.

On February 28, 1984, Granger from the DCFS interviewed the mother again at the home where she and the children lived with her husband's aunt, Evelyn Faedtke. The mother told Granger that she had seen her husband twice and that she no longer believed that Marla had told the truth about being sexually molested by her father. She said Marla had denied her earlier statements.

The petition for wardship was filed on February 29, 1984, and the children were placed in foster care.

The next interview took place in May 1984, when Gabriella Cohen of HELP, Inc., talked to Marcus. Cohen testified that Marcus mentioned that he and a "Jimmy" had had sex play. Marcus told Cohen of incidents in which he, his father, and Marla were in the bathroom, and sometimes in the bedroom, where his father had Marcus put his penis into his father's mouth and Marcus would "pee" into his father's mouth. Marcus said his father would put his own penis into Marcus' mouth and ask Marcus to rub it. Marcus also told Cohen that he saw his father touch Marla's vagina. Using an anatomically correct doll, Marcus stuck his finger into its anus and said his father did this to Marla.

In the May interview, Marcus also told Cohen that his mother was in the bathroom when some of the bathtub incidents occurred. Marcus told another social worker, Shirley Robinson, that his mother had participated in the sexual contacts. However, at trial he denied that she was in the bathroom or participated in any sexual incidents. He also said that he touched her "by her pee-pee" and that it felt "fur and skinny." The transcript of the proceedings reveals that, after repeated questioning by various attorneys, Marcus consistently denied that his mother touched him sexually or that he touched her, except for the one time, which he later denied.

Cohen agreed with defense counsel's observation that the children's accusations had become more descriptive as time went on.

Shirley Robinson, director of the Child Sexual Abuse Treatment Center in Bolingbrook, Illinois, testified that she evaluated Marla and Marcus on August 7, 1984. Marla drew a picture of her father and explained to Robinson what she was drawing. She drew a "pee-pee" on him with a red crayon and said that there was "pee-pee" coming out. She colored the arms of the figure with pink crayon, "with a great deal of perservation." Marla said she was not going to give daddy a mouth because he would spank her if she did.

According to Robinson, Marla told her that she was not living at home because her father had touched her "down here," indicating the genital area. She said her father sometimes hurt her when he rubbed her genitals.

Robinson interviewed Marcus, who told her that his father did "bad things," touching his "pee-pee." At Robinson's request, Marcus used an anatomically correct doll to demonstrate what his father did to him. He said his father would suck his penis and it felt like he was "sucking all the blood out." He also sucked his father's penis. According to Robinson, Marcus told him that his mother also had sexual contact with him, inserting her finger in his anus.

The mother, called as an adverse witness, testified that she had been married to Mervyn E. for nine years and that she took the children to Oregon in December 1983 because of marital problems. She identified her signature on a statement taken in Oregon, which gave the reason for her departure as her husband's "severe mental and physical abuse" of herself and her children. At trial she stated that she was unable to read and that the statement that was read to her before she signed did not say the same thing as the document read at trial.

The mother testified that she bathed the children in the evenings and that she never saw her husband give either child a bath. She

found out that Marla's Uncle Denny had given Marla baths in the morning and that he played with her then. When she found out, she complained to her sister and requested that Denny quit giving Marla baths.

Marcus, then seven, was called as a State witness. In chambers, he told the court that "nothing ever happened in the bathroom." He never saw his father touch Marla. He also said that his dad, Marla and he would play "suck your pee-pee." He and his father sucked each other's "pee-pees."

On questioning as to his mother's participation, Marcus testified that his mother was never present and that she did not touch him in the bathroom. He also said that he touched her near her "pee-pee" and that it felt "fur and skinny," but later he said he never touched her. He also testified that his father stuck his finger "way in" Marla's "pee-pee," although he had previously stated he never saw his father touch her.

Marcus testified that he had no Uncle Denny and that he had never been to Oregon or on a vacation with his mother. He used the phrase "lies, lies, lies" at one time but did not remember what he meant.

DEFENSE

The mother's attorney called Marla, age four, to testify. In chambers, she stated that her mother was good and her father was bad because he spanked her a lot. She said he never did anything else that made her feel bad, but then she said her daddy was nasty because he had played "down here" (indicating her genital area). Marla denied that either her father or Uncle Denny had ever given her a bath.

Eveyln Faedtke, Mervyn's aunt and the owner of the house where the family had lived, testified that her nephew worked five to seven days a week. He arose at 5 a.m. or 6 a.m. and left for work about 6 a.m. She said that the children did not get up until 7:30 a.m. and that their mother customarily bathed them. She never saw the father bathe them and she only saw him hit Marcus once. She never saw either parent mistreat the children and they appeared to be happy, well-dressed, and fed.

Mervyn, the children's father, testified that he had struck the children but denied sexually abusing them. He never bathed the children. He denied that they ever observed him nude and that he ever had them touch his private parts.

The mother, Melody, testified that she never saw the children and her husband together nude. She saw her husband hit Marcus in the

head twice.

When she returned to Chicago from the Oregon visit, she telephoned her sister to ask if Denny, her brother-in-law, had done something to Marla. She learned that Denny had given Marla baths in the morning while Melody was taking Marcus to school.

Melody further testified that two or three days later the police took them to the station. Gabriella Cohen showed Marla an anatomically correct doll at the station and said, "Let's pretend daddy will give a bath." Marla told Cohen that her mother gives her baths, not her father.

The trial court ruled that the State had proven its case of abuse against the parents, finding that it did not believe that the children made up the accusations of sexual abuse. The court did not believe that Cohen made up the allegations, either. Accordingly, it entered a finding of abuse as to each child and a substantial risk of physical injury.

On January 28, 1985, and March 28, 1985, the court held a dispositional hearing. Two caseworkers reported that the parents had failed or refused to attend therapy because they maintained their innocence. The mother had filed for divorce from the father, but both wanted the children placed with Mrs. Faedtke, the father's aunt. Caseworkers opposed this because they believed that she should have been aware of the abuse and because she did not believe that they had been sexually abused. According to one caseworker, the foster mother stated that the children told her that they had been dragged around with leashes and chains while in the aunt's home and had been forced to clean up after their parents had defecated in bed.

Cohen, who was acting as the children's therapist, testified regarding the children's behavior in the sessions. Asked if he wanted to see his father, Marcus said "yes" and then made a clay figure of his father and cut it into pieces. Marla kissed a doll and told it it was going to be adopted. They did not tell Cohen that they had been dragged around by chains. Cohen believed that the aunt would not be able to cope with the children. She also recommended that the father's visitation should be discontinued because the children were reacting severely after his visits.

Faedtke, the aunt, testified that before their removal from her home they were happy, normal children. They never used the foul language attributed to them until they were placed in foster care, and she felt that someone had "programmed" them.

The court found that it was in the children's best interest to adjudicate them wards of the court. The father was denied visitation un-

til further order of court and was ordered not to harm the mother or children. The father's aunt was granted visitation at the discretion of the caseworkers.

## MOTION FOR NEW TRIAL

The mother moved for a new trial based on trial errors and newly discovered evidence. Marla had made recent statements identifying the grandmother, who was suffering from terminal cancer, paternal aunt, and another uncle, Leslie, as having sexually abused her. The uncle and aunt were in court prepared to testify and the affidavit of the grandmother was offered. Defense argued that this evidence went to the children's credibility and bias of the witnesses who reported the children's alleged statements. The judge denied the motion.

The judge restored the father's visitation rights, under supervision, twice a month.

## OPINION

■■ Unlike the focus of a criminal prosecution for child sexual abuse, a neglect proceeding under the Juvenile Court Act centers on the welfare of the child victim. We doubt that cases of this sort can be neatly wrapped in legal principles. Certainly, the contradictory statements of the children in this case are disturbing, especially since we have only the dry transcript and have no opportunity to assess the demeanor and credibility of the witnesses. We do believe, however, that the trial judge in this case carefully considered the evidence before reaching his determination that the children had been abused.

Both parents, in their separate appeals, contend that the findings of sexual abuse are not supported by competent, credible evidence and must be reversed. They further contend that section 4—6(4)(c) of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 704—6(4)(c)) is unconstitutional because it allows hearsay evidence of abuse to stand as substantive evidence, violating their rights to due process of law. In essence, they assert that the admission of the children's out-of-court statements—as "corroboration" of the charges of sexual abuse—violated their constitutional rights and that the weight of this evidence was inadequate to establish their violation of the law.

### I

According to the parents, statements that the State's witnesses attributed to the children constituted uncorroborated hearsay. They contend that this violated their rights to due process of law.

■■ The statute under which the evidence was admitted, section

4—6(4)(c) (Ill. Rev. Stat. 1983, ch. 37, par. 704—6(4)(c)), provides:

"Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect."

Plainly, the first sentence of this section allows the admission, at trial, of children's out-of-court statements that are being offered to prove the truth of the matter asserted, the classic definition of hearsay. (See *Goshey v. Dunlap* (1973), 16 Ill. App. 3d 29, 34, 305 N.E.2d 648.) Just as plainly, the second sentence does not allow the hearsay statements alone to establish abuse or neglect.

██ █ We do not believe that the legislative decision to allow hearsay evidence to be admitted under this section deprives parents of constitutional rights. Prohibitions against hearsay grew out of the concern that such testimony may not be reliable because it is not made under oath, in court, subject to cross-examination. (See generally E. Cleary, McCormick on Evidence §245, at 581 (2d ed. 1972).) On the other hand, courts have long recognized numerous exceptions to the rule against hearsay, such as excited utterances and statements for purposes of medical diagnosis or treatment. In the context of sexual abuse against children, some commentators have noted that "attempts to stretch a traditional hearsay exception to cover the pervasive and unique problem of child sexual abuse" often results in " 'tortured' interpretations of the traditional exceptions." (Skoler, *New Hearsay Exceptions For a Child's Statement of Sexual Abuse*, 18 J. Marshall L. Rev. 1, 7 (1984).)[1] Section 4—6(4)(c) of the Juvenile Court Act appears to create a new, statutory exception to the general rule against hearsay in the context of child abuse cases.

The parents' due process argument is based on the assertion that they must be given a right to confront and cross-examine witnesses who testify against them before being deprived of the right to raise their own children. Presumably, the statute curtails that right.

██ We cannot agree that section 4—6(4)(c), in allowing the children's hearsay statements to be admitted, infringes on parents' con-

---

[1]Skoler, a psychologist, describes the difficulties inherent in child sex abuse prosecution and advocates the use of new hearsay exceptions to allow courts to address the problem meaningfully. His article analyzes constitutional challenges similar to the ones that the parents make in the pending case and concludes that creation of "a new hearsay exception for child reports of sexual abuse is necessary, inherently reliable" and protects children from the trauma of testifying in court. 18 J. Marshall L. Rev. at 7.

stitutional rights to due process of law. On its face the statute provides that the out-of-court statements will not support a finding of abuse if "uncorroborated and not subject to cross-examination." Ill. Rev. Stat. 1983, ch. 37, par. 704—6(4)(c).

In the pending case, the children both testified at trial and the parents' attorneys questioned them regarding their prior statements as well as trial statements. Accordingly, the minors who made the statements, as well as the witnesses who repeated them, were subject to both confrontation and cross-examination at trial. To the extent the parents argue that they were deprived of the right to confront the children directly at trial (since the Act allows the children to testify in chambers), other courts have noted that the confrontation clause of the sixth amendment applies specifically to criminal proceedings, and dependency neglect adjudications are not criminal prosecutions. (See Ill. Rev. Stat. 1983, ch. 37, par. 704—6 (standard of proof and rules of evidence for neglect matters are in nature of civil proceedings); *Smith v. Edmiston* (W.D. Tenn. 1977), 431 F. Supp. 941, 945; see also *In re Brooks* (1978), 63 Ill. App. 3d 328, 379 N.E.2d 872.) The legislature, in allowing hearsay statements of minors to be admitted as evidence, did not allow the finding of abuse to be based solely on that evidence. This, we believe, safeguards the parents' rights, balancing their interests with the courts' need to consider the minors' prior statements as probative on the question of whether abuse or neglect occurred.

The statute does not change the burden of proof, as the State must still present sufficient, credible evidence that abuse occurred. It does facilitate the admission of critical evidence that might otherwise be barred under traditional rules of evidence. In cases involving adults' sexual abuse of children, especially their own, proof is problematical. The children generally are not in a position to report the abuse unless and until they feel some safety in talking about the situation to strangers such as social workers and therapists. To increase the likelihood of finding the truth, the legislature has determined that minors' statements regarding abuse, made to others prior to trial, shall be admissible, although not conclusive, on the findings of abuse. We do not find that the statute violates due process on its face or as applied in this case. See *In re K.L.M.* (1986), 146 Ill. App. 3d 489, 496 N.E.2d 1262 (which rejects a constitutional challenge to the statute).

■ The parents' argument that the statute is vague or overbroad for want of standards likewise must be rejected. The section embodies a rule of evidence, not a proscription of specific conduct. Moreover, the parents do not explain what is vague about the statutory reference to "previous statements," despite their challenge to the court's

interpretation of the term. We believe that "previous statements" refers to those statements concerning the alleged abuse that the children make to others outside of court.

The parents' true concern appears to be the reliability of the detailed statements that Marla and Marcus made over time, while in foster care and in therapy. The record does reflect that as the months passed, the children's descriptions of abuse became more detailed and elaborate. This may raise questions concerning the children's credibility, but it does not mean that section 4—6(4)(c) is vague or overbroad. As we previously discussed, the children's out-of-court statements may be used only in conjunction with corroborative evidence to support a finding of abuse. The parents have given us no persuasive argument that the wording of the statute is vague, overbroad, or violates the due process clause or any other clause of the Federal or State Constitutions. We therefore reject the constitutional challenges to the statute.

## II

Having determined that the children's statements to various third parties were properly admitted at trial, we next consider whether that evidence was corroborated at trial. As the court noted in *In re Custody of Brunken* (1985), 139 Ill. App. 3d 232, 487 N.E.2d 397, such corroborating evidence must be evidence which by its nature makes it more probable that the child was actually abused, and the corroboration of a child's claim of abuse requires more than the fact that two or more witnesses may testify that the child related the claims to them.

In this case there was no independent witness to the abuse and no physical or medical evidence. Nevertheless, the statements that the witnesses attributed to Marcus were corroborated, at least in part, by the child's trial testimony in chambers. Under the Juvenile Court Act, children are presumed competent to testify. (Ill. Rev. Stat. 1983, ch. 37, par. 704—6(4)(d).) We are not aware of any requirement that the child's trial testimony be independently corroborated or that it be "clear and convincing." In fact, the court in *In re T.H.* (1986), 148 Ill. App. 3d 877, 499 N.E.2d 988, specifically rejected the argument that the child's testimony could not sustain a finding of abuse unless it was clear and convincing or independently corroborated. The standard of proof is the preponderance of evidence, and the primary consideration is the best interest and welfare of the children. (*In re Simmons* (1984), 127 Ill. App. 3d 943, 469 N.E.2d 215.) After carefully reading the transcript, we find that the evidence as to the fa-

ther's abusive behavior was sufficient, but that the evidence as to the mother's behavior was not.

## THE CASE AGAINST THE FATHER

Marcus told the judge that he and his dad and Marla played a game, "suck your pee-pee." Marcus testified that he would suck his father's penis and his father would suck his. In his words, it felt "hard, and feels like blood coming out." He also said that his father put his finger in Marla's "pee-pee."

In addition, the record contains evidence that the mother left the father and went to Oregon because of the abusive behavior of the father. Although she later decided that the father had not sexually abused Marla, she testified that her father had hit Marcus on several occasions.

We believe that the above evidence corroborates some of the statements that the State's witnesses attributed to Marcus. He had told both Cohen and Robinson of acts of fellatio that had occurred in the bathroom and bedroom. The description he gave them is substantially the same as what he testified to in chambers. As for the father's abuse of Marla, the social worker's testimony that Marcus told her that his father put his finger in Marla's vagina was corroborated by Marcus' in-court testimony.

■■ The trial judge did not believe that the social workers' testimony had been fabricated. Nor did he believe that the children made up the allegations. We conclude that the adjudication of neglect, based upon the finding of the father's sexual abuse of the children, is not against the manifest weight of the evidence. The fact that Marcus' in-court and out-of-court statements did not mirror each other does not mean that he made up the allegations or that he was not in fact abused. Repeated or leading questioning by adults on sensitive matters may cause a child to state what he believes is expected of him by the particular questioner. Some types of questions may suggest certain answers; others may be just plain confusing. The children were questioned by attorneys for all of the parties, the State, the father, the mother, and the guardian. The questions asked by the various attorneys often overlapped, although the lawyers had differing purposes and undoubtedly hoped to elicit responses favorable to their clients. Some confusion may have arisen over the attempt of the various attorneys to pin down certain details of possibly marginal relevance, such as the particular room in which the sexual abuse occurred. For example, many questions focussed on what happened in the bathroom. Marcus had testified to acts of fellatio, at one point indicating that

there was such one occasion in the bathroom in which Marla was present. On cross-examination, one of the parent's attorneys asked, during cross-examination, the following, "Did you tell me before that you put your pee-pee in your daddy's mouth *once?*" (Emphasis added.) Marcus replied, "Yes." The attorney then asked, "Now today, you said it happened lots of times. Did it happen once or lots of times?" Marcus answered, "Lots of times." While there may have been an attempt in this questioning to show that Marcus' testimony contradicted itself, it appears from Marcus' other testimony that the fellatio incidents had occurred in both the bathroom and bedroom. Hence, it would not be inconsistent to say a certain incident happened once (in the bathroom) and lots of times (in the bedroom).

We do not find Marcus' testimony to be without contradictions, however. In fact, he made different statements concerning who was present when his father was abusing him, whether his mother was there, and what his father did to Marla. Our review of the record, however, leads us to concur in the trial court's decision concerning the father's abuse of both children. There is sufficient evidence to support the court's finding and we must defer to the court's determination as to the credibility of the witnesses. See *In re T.H.* (1986), 148 Ill. App. 3d 877, 499 N.E.2d 988.

THE CASE AGAINST THE MOTHER

■ The evidence against the mother, however, is a different matter. Marla did not accuse the mother of any sexual abuse and, in fact, testified in her favor at trial. Marcus' statements in May 1984, to the effect that his mother sexually abused him by inserting her finger into his anus, was uncorroborated by any evidence, including Marcus' trial testimony. At trial, Marcus did not state that his mother abused him in any way. He did state, at one point, that he touched her "near her pee-pee" and that it felt "fur and skinny." That was the sole statement from which abuse could be inferred, and he contradicted it himself by repeatedly denying that she had touched him or that he had touched her. He specifically stated that she was not present when the father was abusing him. There was no evidence presented that she knew that the father was sexually abusing the children, at least until she left him to go to Oregon. The inference that she left him because he was abusing the children does not establish that she had allowed him to do so or was abusing them herself. Therefore, we conclude that the State did not establish that the mother abused the children or knowingly allowed the father to do so.

While we reverse that portion of any findings that include the

mother as an active or even passive participant in the sexual abuse, we affirm the court's implicit finding that she was unable to prevent the abuse from occurring. The record indicates that the mother was, at least to a degree, mentally or educationally handicapped. At the time the abuse was occurring she may not have been able to protect the children from her husband. She later decided that he did not sexually abuse the children. For that reason the trial court's adjudication of wardship, based on the finding that the family environment was harmful to the children, was justified. The safety of the children was of paramount importance, and their removal from the parents' home was necessary, even if the mother was not directly responsible for the abuse. She did leave her husband, for the sake of herself and her children, when she went to Oregon. The record also contains information that after the trial, when the children were made wards of the State, she divorced her husband, underwent therapy, and attempted to find employment and a home for the children in the hopes of regaining custody. Her parental rights and interests were not terminated but, necessarily, were subordinated to the safety of the children. See *In re Gonzales* (1974), 25 Ill. App. 3d 136, 143-44, 323 N.E.2d 42 (court may use a flexible standard of proof to accommodate different factual situations).

### III

The parents next challenge the fairness of the trial, asserting that two of the State's witnesses improperly gave expert opinion testimony when they were not tendered or accepted as expert witnesses. This argument focuses on the testimony of Gabriella Cohen and Shirley Robinson, who testified regarding their use of tools and techniques to elicit statements from the minors. Cohen admitted that the books and drawings that she had used in questioning the children had not been standardized and that their validity had not been proven. Robinson gave her conclusion that Marla's use of the color red in a drawing of her father indicated possible abuse. According to the parents, this is reversible error.

We do not agree. Cohen and Robinson, both of whom had substantial experience in child sex abuse cases, related what had transpired during their interviews with the children. Cohen's book of pictures, standardized or not, was used in the course of an interview designed to help a small child describe what had happened to her. Cohen did not give her own opinion regarding the parents' abuse of the children, nor would she have been allowed to, as she was not offered as an expert to give opinion testimony. Her description of the book and

Marla's reactions to certain pictures was simple narrative, subject to cross-examination, and the court did not hear testimony from an expert as to how the statements should be interpreted.

The one conclusion that the trial court allowed in evidence was Robinson's statement that Marla's use of a red crayon to draw her father's penis was "indicative of sexual abuse." The trial judge elicited this response by asking the witness what conclusion she had drawn from the use of the red color. Technically, this conclusion, which was not based upon facts in evidence, should not have been admitted. Robinson simply told the judge that there was some published research indicating that the drawing of a penis in red indicates sexual abuse and that the majority of children who do that have been molested. This testimony, for what it is worth, probably should have been stricken. Nevertheless, we do not find it to be reversible error. The State's case did not turn on the color of crayon Marla used in drawing her father, and the testimony concerning it seems of little importance, particularly since this was not a jury trial. We find the admission of the conclusory statement to be harmless error. See *In re K.L.M.* (1986), 146 Ill. App. 3d 489, 496 N.E.2d 1262.

The mother asserts that the trial court committed further error by allowing the State to repeatedly question her about a document that she signed in Oregon, which accused her husband of physical and psychological abuse. The mother, unable to read, apparently signed the statement after it was read to her. At trial, she denied that the person in Oregon who read her the statement used the same words as the State's attorney did in reading portions of the statement at trial. Since her testimony at trial arguably contradicted some of the allegations in the document, she now argues that the State's use of the statement for impeachment was improper because the State did not offer the document as an exhibit and did not complete its impeachment by bringing in the person who had prepared the document.

We find little merit to this argument. We do not find that the State's questions regarding the document seriously impeached her trial testimony because she never denied that she and the children left for Oregon because of marital problems and because her husband was hitting Marcus. The State read from the document that she left "because of severe mental and physical abuse to [her] and her children." She denied that that line was read to her. She did agree, however, that she had been having marital problems and that she was fearful for the children. The Oregon document apparently did not specify sexual abuse as a reason. In any event, we do not find that the attempted impeachment, if it was that, had any real bearing on her

credibility because she did not deny that the statements in the document were true; she simply testified that she could not read it herself and that she did not recall it being read to her in the manner that the State's Attorney did at trial.

The parents list some final objections to the trial proceedings, none of which amount to reversible error. The trial court's comments on the case during his oral ruling indicate his awareness and consideration of all of the evidence. Overall, the parents received a fair trial. The standard of proof requires only that it appear more likely than not that abuse occurred. As we have held, we are satisfied that it did, that the father and we have held, we are satisfied that it did, that the father and mother were unable to provide a safe environment for the children, and that the trial court's findings and disposition are appropriate.

For the foregoing reasons, we affirm the findings of the trial court as to the father's abuse of the children, reverse the finding that the mother abused or knowingly allowed the abuse to occur, and affirm the dispositional ruling that placed the children in foster care. The parents' rights were not terminated and one or both may regain custody at a later date.

Affirmed in part; reversed in part.

JIGANTI, P.J., and JOHNSON, J., concur.