576 N.E.2d 346 (1991)
216 Ill. App.3d 410
159 Ill.Dec. 677
In the Interest of B.W. and R.W., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Tracy Winlund, Respondent-Appellant).
v.
Tracy Winlund, Respondent-Appellant).
No. 1-89-3070.
Appellate Court of Illinois, First District, Second Division.
June 28, 1991.
*347 Jack O'Malley, State's Atty., Cook County, Chicago (Renee Goldfarb, William Pistorius and David Franks, of counsel), for petitioner-appellee.
Tim Biasiello, Chicago, for respondent-appellant.
Justice HARTMAN delivered the opinion of the court:
The circuit court found that one-year-old B.W. and four-year-old R.W. were neglected, and that B.W. was abused. Respondent-mother, Tracy Winlund (Tracy), appeals, raising as issues whether (1) the State proved by a preponderance of the evidence that B.W. was abused and neglected; (2) R.W.'s hearsay declaration was properly admitted; and (3) the circuit court erred in denying her motion to dismiss for failure to conduct an adjudicatory hearing within the statutory period. We affirm.
On July 12, 1988, petitions for adjudication of wardship were filed on behalf of both R.W. and B.W., alleging that the children were neglected due to their injurious environment. B.W.'s petition also alleged *348 that he was abused. The Cook County public guardian was named guardian ad litem for both minors, and an adjudicatory hearing on the petitions was held on April 20, 1989.
Dr. Starvos Maltezos, an expert in neurosurgery, testified on behalf of the State. He had performed a detailed neurological examination of B.W. on July 7, 1988, and found that the child was quadriplegic, was able to move only his head, had no bladder or bowel control, and subsequently became respirator-dependent. B.W. had a five-centimeter fracture at the back of his skull, contused lips, and part of his face was discolored as if it had been bruised. There were no other signs of external trauma. Although a CT scan of B.W.'s cervical spine appeared normal, an MRI scan showed that his spinal cord was swollen.
Tracy told Maltezos that B.W. had been playing at the pool in her apartment complex with David Young, her live-in boyfriend. When B.W. became listless, she laid him on a towel and covered him. Thinking that the child had become overheated, she took him inside and tried to cool him in the bathtub. His condition did not improve, and Tracy took him to the hospital. Young told Maltezos that B.W. bruised his lips when he fell against a lawn chair; Tracy said that the discoloration on his face was from a rug burn and had been there since May, and the skull injury may have been due to a fall from a swing on the previous day or a fall in the bathtub two weeks earlier. Maltezos found it unlikely that a child experiencing a routine fall would sustain so severe an injury and Tracy's explanations were inconsistent with B.W.'s injuries. Maltezos concluded that there was a high probability of child abuse and contacted the Department of Children and Family Services (DCFS). He said that B.W. was probably a victim of the "shaken baby syndrome," which occurs when the child is held by the torso and shaken violently. Maltezos testified that B.W. could have received these injuries from being thrown into a crib.
On cross-examination, Maltezos said that B.W. had been hospitalized in May 1988 for treatment of a febrile and septic condition, but that he had not seen the medical records from that prior visit. Although the child had undergone spinal taps at that time, Maltezos was unaware of the results of the spinal fluid analysis. B.W. also had been treated for a rash on his forehead. Maltezos said that the skull fracture, by itself, could not cause paralysis. The paralysis resulted from damage to the spinal cord, which was caused by either direct contusion, vascular infarction, or inflammation from an infection.
Robert W., father of both R.W. and B.W., testified that on July 10, 1988, his ex-wife Tracy told him that B.W. had experienced a seizure; had fallen from a swing, had slipped and fallen while in the bathtub; and had hit his head on a table in her apartment. After he had received custody of R.W. in July 1988, R.W. told Robert that "daddy Dave had thrown [B.W.] in the crib." According to Robert, "daddy Dave" referred to Young.
Following this testimony, the State rested. Robert and the guardian ad litem both rested without presenting any evidence.
Mary Riley and Morgan Riley, Tracy's mother and sister, testifying on her behalf, said that B.W. was able to move all his limbs when they saw him on July 6, 1988. He had diarrhea and was crabbier than usual, but was otherwise normal. Following his hospitalization in May 1988, B.W. was unable to use one of his legs and dragged it for the next two weeks.
Dr. Dale Buchbinder, an expert in surgery, reviewed B.W.'s medical records and interviewed Tracy. He never examined B.W. He testified that B.W.'s paralysis was unusual in that there was no evidence of a cervical spinal fracture and no documented traumatic injuries to the spine. Further, B.W.'s quadriplegia was not causally connected to any physical trauma. In his opinion, the records could not justify a finding of abuse. B.W. might have experienced seizures, or may have sustained an infection, as evidenced by the diarrhea. Although the skull fracture could have been caused by any of the incidents which Tracy *349 related, Buchbinder was unable to explain the paralysis.
Tracy testified that B.W. had experienced many health problems since his birth. In May 1988, he had developed a rash on his head, was listless, and was not eating properly. He was hospitalized for five days and, following his discharge, dragged his left leg. The hospital staff told Tracy that B.W. only had a muscle spasm.
On July 7, 1988, B.W. ate and was able to use all his limbs. Tracy left at 10:30 a.m. on that day and returned home in the afternoon. Young, who had stayed with B.W., reported that the child had fallen against a lawn chair in the pool area and hit his lip. Tracy laid B.W. on a towel and he began to convulse, vigorously shaking his head. When Tracy picked him up, the child was sweating and moved very little. After Young tried to cool B.W. in the bathtub, Tracy took him to the hospital. She explained that B.W. had fallen against a chair, had previously fallen in the bathtub, and had fallen while at her mother's house. She cried and felt very upset when the doctor told her that B.W. was quadriplegic. She testified that she never struck B.W. and had not seen anyone else hit him.
The court concluded that B.W. had been abused (see Ill.Rev.Stat.1989, ch. 37, par. 802-3(2)(i)), and that both B.W. and R.W. were neglected due to their injurious environment (see Ill.Rev.Stat.1989, ch. 37, par. 802-3(1)(b)).
At a further hearing held October 12, 1989, on Tracy's motion to vacate the court's previous findings, Tracy offered the affidavit of Dr. Peter Huttenlocher, a pediatric neurologist, who had reviewed B.W.'s medical records, including the 1988 CT scan of B.W.'s head. The skull fracture occurred in May 1988 and could not have been sustained in June or July of 1988. B.W. had a syrinx, a fluid-filled cavity within the spinal cord, which caused his paralysis. Trauma was a possible cause of a syrinx. He concluded that the records and testing did not indicate that B.W. had been abused. After argument, the court denied Tracy's motion. At B.W.'s dispositional hearing, pursuant to the recommendation of a DCFS child welfare specialist, the court awarded guardianship to DCFS with the right to place.

I.
Tracy first contends that the State failed to prove by a preponderance of the evidence that B.W. had been abused and neglected. Specifically, she argues that Dr. Maltezos' testimony failed to establish that B.W.'s paralysis was caused by child abuse.
An abused minor is one whose parent, family member, or person responsible for the minor's welfare inflicts or allows to be inflicted upon the minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical health, or loss or impairment of any bodily function. (Ill.Rev.Stat.1989, ch. 37, par. 802-3(2)(i).) The circuit court has broad discretion in determining the existence of neglect and abuse, and its findings will not be disturbed unless they are against the manifest weight of the evidence. (In re L.M. (1989), 189 Ill.App.3d 392, 399, 136 Ill.Dec. 795, 545 N.E.2d 319.) Because of its ability to observe witnesses and judge their demeanor, the circuit court is in the best position to determine their credibility. In re S.M. (1988), 171 Ill. App.3d 361, 365, 121 Ill.Dec. 507, 525 N.E.2d 565.
The State's evidence established that B.W. was quadriplegic upon his arrival at the hospital and had sustained a spinal cord injury, an occipital fracture, and bruised lips. Dr. Maltezos, who examined B.W., spoke to Tracy, but found her explanations to be inconsistent with the severity of the child's injuries.
Tracy correctly asserts that an expert's opinion is only as valid as the bases or reasons for it; the circuit court must analyze and evaluate the factual basis for the expert's opinion rather than rely on the ultimate opinion itself. (In re J.H. (1987), 153 Ill.App.3d 616, 631, 106 Ill.Dec. 569, 505 N.E.2d 1360.) Although Maltezos was not able to determine the precise spinal injury cause, he ruled out several possible *350 explanations and gave his opinion based on the physical examination and other available evidence. B.W.'s fall against the lawn chair probably would not have resulted in such a severe spinal injury; if it had, paralysis would have occurred immediately and the child could not have continued to play in the pool. Further, B.W. did not have any symptoms of paralysis after his falls from the swing and in the bathtub. Although such occurrences might cause an occipital fracture similar to that suffered by B.W., Maltezos concluded that it was unlikely that the spinal injury and the skull fracture were sustained in separate incidents.
Maltezos conceded that in May 1988, B.W. suffered from sepsis, or a bacterial infection, which may cause neurological damage to the spinal cord. Such damage generally results at the time of the septic episode. Because two months had since elapsed during which B.W. was generally healthy, his previous septic condition did not cause the quadriplegia. Further, the child did not suffer a febrile seizure, and there was no evidence of any arterial infarction. Based on his quadriplegic condition, swollen spinal cord, occipital fracture, and contused lips, and considering Tracy's unlikely explanations, Maltezos surmised that B.W. probably had been abused. R.W.'s statement, related by Robert, corroborated the doctor's deduction.
Tracy relies heavily upon Dr. Huttenlocher's affidavit, which theorized that a fluid-filled cavity in B.W.'s spinal cord caused his quadriplegia. Huttenlocher's analysis was conducted over one year after the onset of B.W.'s paralysis, however.
Here, the circuit court based its finding not only on the medical evidence and testimony of the examining physician, but also on R.W.'s hearsay statement (see part II) and Tracy's inconsistent explanations of the injury. The judge specifically noted his careful consideration of Tracy's testimony and demeanor. The court also reconsidered its previous finding of abuse in light of Huttenlocher's affidavit and determined that, in spite of the new evidence, the State had proved by a preponderance that B.W. had been abused. That finding, as well as the court's finding that both minors were neglected due to their injurious environment, is not against the manifest weight of the evidence. See In re Simmons (1984), 127 Ill.App.3d 943, 948-50, 82 Ill.Dec. 681, 469 N.E.2d 215.

II.
Tracy argues that R.W.'s hearsay statement should not have been admitted as evidence of abuse. Robert was allowed to testify over Tracy's objection that R.W. had told him "daddy Dave" had thrown B.W. into the crib. According to the State, "daddy Dave" refers to Tracy's paramour, David Young.
The Juvenile Court Act of 1987, makes admissible in evidence previous statements made by the minor relating to allegations of abuse or neglect. If uncorroborated and not subject to cross-examination, however, the statement is insufficient to support a finding of abuse or neglect. Ill.Rev.Stat.1989, ch. 37, par. 802-18(4)(c); In re Marcus E. (1989), 183 Ill.App.3d 693, 703, 132 Ill.Dec. 34, 539 N.E.2d 344.
Tracy contends that the statutory provision is inapplicable because the hearsay statement was attributed to R.W., whereas B.W. was the child alleged to have been abused. The language of the statute, however, indicates that it applies to statements "relating to any allegations of abuse or neglect." (Emphasis added.) The hearsay statement, therefore, is admissible not only as evidence that B.W. was abused, but also as evidence that R.W. was neglected due to his injurious environment. Evidence of abuse, neglect, or dependency of one minor is admissible evidence on the issue of abuse, neglect, or dependency of any other minor for whom the respondent is responsible. Ill.Rev.Stat.1989, ch. 37, par. 802-18(3); In re S.M., 171 Ill.App.3d at 366, 121 Ill.Dec. 507, 525 N.E.2d 565.
In arguing that the State relied solely on the hearsay statement to establish abuse, Tracy cites In re Custody of Brunken (1985), 139 Ill.App.3d 232, 93 Ill.Dec. 730, 487 N.E.2d 397. There, the reviewing *351 court reversed the finding of abuse in the absence of corroborating evidence of claimed sexual molestation by her father. The expert testimony mainly consisted of a description of the type of behavior that a sexually abused child might display. There was no medical evidence of abuse and nothing, other than the minor's visits with her father, that linked the father with the alleged abuse. 139 Ill.App.3d at 239-41, 93 Ill.Dec. 730, 487 N.E.2d 397; see also In re D.P. (1988), 176 Ill.App.3d 456, 458, 126 Ill.Dec. 29, 531 N.E.2d 162.
In contrast here, R.W.'s statement was corroborated by other evidence which the State provided. Corroborating evidence is that which by its nature makes it more probable that the child was actually abused (In re Marcus E., 183 Ill.App.3d at 705, 132 Ill.Dec. 34, 539 N.E.2d 344), and will vary depending on the facts to be corroborated (In re Custody of Brunken, 139 Ill.App.3d at 239, 93 Ill.Dec. 730, 487 N.E.2d 397). The testimony of Dr. Maltezos and the medical evidence indicated that B.W. suffered injuries consistent with those likely to be sustained if he were thrown into a crib. Further, Tracy admitted that she had lived with Young from May to July 1988, and that B.W. was with Young immediately before the onset of his condition. This evidence corroborates R.W.'s statement in that it supplies "facts sufficient to lend credence, support, and believability to a statement made by someone who will not be subject to cross-examination." (In re D.P., 176 Ill.App.3d at 459, 126 Ill.Dec. 29, 531 N.E.2d 162 (Heiple, J., dissenting).) Finally, Tracy's confrontation rights were safeguarded by the fact that a finding of abuse may not rest solely on a minor's hearsay statement. (In re Marcus E., 183 Ill.App.3d at 704, 132 Ill.Dec. 34, 539 N.E.2d 344; see also In re E.P. (1988), 167 Ill.App.3d 534, 541-42, 118 Ill.Dec. 321, 521 N.E.2d 603.) R.W.'s statement, therefore, was properly admitted.

III.
Tracy argues that the circuit court failed to hold an adjudicatory hearing within the statutorily-prescribed 120-day period. Her pretrial motion to dismiss, based on this argument, was denied by the circuit court.
A petition alleging child abuse or neglect requires that an adjudicatory hearing shall be held within 120 days of a written demand made by any party respondent. (Ill. Rev.Stat.1989, ch. 37, par. 802-14(b).) A continuance for good cause temporarily suspends the period within which a hearing must be held. Ill.Rev.Stat.1989, ch. 37, par. 802-14(c).
The guardian ad litem (GAL) here filed his demand for a hearing on July 28, 1988, and the matter was continued on that day to August 17, 1988. Tracy filed her demand on December 27, 1988, 114 days prior to April 20, 1989, the date on which the adjudicatory hearing was held. The matter was continued three times in late 1988 by agreement of the parties. Tracy contends that the 19 days from July 28 to August 17, 1988, should count in the computation of the statutory time period, resulting in 133 elapsed days between the demand and the hearing.
The half-sheet indicates that on July 28, 1988, the matter was continued by order of the court. The transcript of the hearing on that date reads:
"THE COURT: By agreement, order of Court, continued for social and status to August 17, 1989 [sic]."
A continuance made by order of the court or with the consent of the adverse party may constitute good cause required by section 2-14(c). (See Ill.Rev.Stat.1989, ch. 37, par. 802-14(c), referring to 134 Ill.2d R. 231(a)-(f).) The 19 days between July 28 and August 17, therefore, were not part of the 120-day period.
Further, the initial demand for an adjudicatory hearing was filed by the GAL. On April 20, 1989, during the hearing on Tracy's motion to dismiss, the GAL expressly stated that he was not asserting any rights which he might have under his demand at that time. The applicable statute also provides that "[i]f the adjudicatory hearing is not heard within the time limits * * *, upon motion by any party for whom a motion to start time was made, the *352 petition shall be dismissed with prejudice." (Ill.Rev.Stat.1989, ch. 37, par. 802-14(c).) (Emphasis added.) In this situation, the GAL is the proper party to enforce the statutory time limit, which the GAL declined to assert.
For the foregoing reasons, the judgment of the circuit court is affirmed.
Affirmed.
SCARIANO, P.J., and DiVITO, J., concur.